**June HALL, Administratrix of the Estate of Sallie Mae Hall, Deceased, Appellant**

**v.**

**EPISCOPAL LONG TERM CARE, Appellee.**

**June Hall, Administratrix of the Estate of Sallie Mae Hall, Deceased, Appellee**

**v.**

**Episcopal Long Term Care, Appellant.**

Superior Court of Pennsylvania.

Submitted June 4, 2012.

Filed Sept. 27, 2012.

Stephen Trzcinski, Philadelphia, for Hall.

J. Kurt Straub, Philadelphia, for Episcopal Long Term.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., and COLVILLE, J.[*]

OPINION BY STEVENS, P.J.

In this nursing home negligence action, judgment in the amount of $154,902.98 was entered in favor of June Hall, as Administratrix of the Estate of Sallie Mae Hall, deceased, (collectively "the Estate") after the jury awarded compensatory damages for the injuries the deceased suffered as a result of neglect while she was a resident at the Philadelphia Nursing Home (hereinafter nursing home), which was operated by Episcopal Long Term Care (hereinafter Episcopal). The Estate filed an appeal, and Episcopal filed a cross-appeal from the judgment. After a careful review of the parties' numerous issues, we affirm the judgment as it relates to the jury's award of compensatory damages to the Estate, but reverse and remand for further proceedings as to punitive damages.

The relevant facts and procedural history are as follows: On May 31, 1996, the deceased, who suffered from various health problems, was admitted as a resident in the nursing home, where she primarily resided until her death on January 17, 2005, from cerebral vascular disease. The Estate instituted this action by filing a writ of summons on May 17, 2005, and on July 20, 2005, the Estate filed a civil complaint against various parties, including Episcopal,[1] presenting negligence and assault/battery issues as wrongful death and survival claims.

Episcopal filed an answer with new matter averring, *inter alia*, that any claims for injuries allegedly occurring prior to May 17, 2003, were barred by the statute of limitations. On May 27, 2008, Episcopal filed a motion seeking to amend its answer and new matter to present the defense of governmental immunity, and by order entered on June 30, 2008, the trial court denied the motion; however, Episcopal filed a motion for reconsideration, which the trial court subsequently granted, thus permitting Episcopal to file an amended answer with new matter. Thereafter, Episcopal filed an answer with new matter asserting, *inter alia*, the defense of governmental immunity, and Episcopal filed various motions for summary judgment. By orders entered on September 22 and 23, 2008, the trial court denied Episcopal's motions for partial summary judgment as to the claims of corporate liability and punitive damages. However, the trial court granted Episcopal's motions for par-

---

[*] Retired Senior Judge assigned to the Superior Court.

1. The Estate also named Episcopal Hospital Corp., the nursing home, Temple University Health Systems, Cross–Country Healthcare, Inc., Med–Staff, Inc., and Joan Wood Barnes as defendants. The parties stipulated to the discontinuance of the claims against the nursing home, Episcopal Hospital Corp., and Temple University Health Systems. Cross–Country Healthcare, Inc. and Med–Staff, Inc. were dismissed when the trial court granted their motions for summary judgment.

Additionally, on April 8, 2008, Episcopal filed a motion seeking to sever this action from the claims involving Joan Wood Barnes, and the trial court granted Episcopal's motion, thus severing the Estate's claims against Ms. Barnes from the claims presented against the remaining defendants. Ms. Barnes was an agency nurse who, while on duty at the nursing home, severed the PEG feeding tubes of six residents, including that of the deceased. Ms. Barnes was convicted of various crimes and sentenced to serve concurrent terms of seven and one-half months to twenty-three months in prison, to be followed by two years of probation. After the trial court severed the civil claims against Ms. Barnes from the instant case, on April 1, 2009, the Estate discontinued the action against Ms. Barnes without prejudice.

tial summary judgment as to the Estate's wrongful death claims and Episcopal's statute of limitations defense.[2] With regard to the latter, the trial court held that judgment was entered in favor of Episcopal regarding all claims of negligence, damage or injury based on events or occurrences, which took place prior to May 17, 2003.

Episcopal filed 23 motions *in limine* on a variety of evidentiary issues including, *inter alia*, staffing, facility medical charts, testimony of former employees, jury selection, jury instructions, expert testimony, and the statute of limitations, all of which were denied by the trial court. The trial court granted several discovery requests in favor of Episcopal on issues such as employee personnel files.

On October 14, 2010, the matter against Episcopal, the only remaining defendant, proceeded to a jury trial on the sole survival claim of negligence.[3] At trial, the Estate commenced its case with the testimony of Edith Cleveland, the granddaughter of the deceased, who testified the administratrix, June Hall, is the great-granddaughter of the deceased. N.T. 10/14/10 at 6–7. While Ms. Cleveland is a listed beneficiary of the deceased's estate, June Hall is not a beneficiary. N.T. 10/14/10 at 14. Ms. Cleveland admitted she did not visit the deceased "that often" when she was a resident at the nursing home. N.T. 10/14/10 at 13. Ms. Cleveland indicated the deceased was not mobile, had a PEG tube for feeding purposes, suffered partial paralysis due to a stroke, and had cataracts. N.T. 10/14/10 at 13–15. When Ms. Cleveland visited the nursing home, she would complain to the staff that the deceased's hair was not combed or washed, her breath smelled bad, and her diaper was wet. N.T. 10/14/10 at 15–16. Although she attended care conferences to voice her complaints, and the nursing home staff assured her the hygiene issues would be rectified, Ms. Cleveland observed the same issues on multiple subsequent visits. N.T. 10/14/10 at 17–18. Ms. Cleveland admitted the deceased "would yell and scream when she was touched or moved." N.T. 10/14/10 at 24. Ms. Cleveland recalled observing the nursing home nurses assist the deceased with passive range motion exercises to her arms and legs and the deceased "would yell and scream." N.T. 10/14/10 at 24. Ms. Cleveland indicated that when the deceased was in pain the staff would not continue with the exercises. N.T. 10/14/10 at 26. On at least one occasion, Ms. Cleveland washed the hair of the deceased, who yelled and screamed. N.T. 10/14/10 at 31. Ms. Cleveland admitted that, when she complained the deceased was sitting in a wet diaper, the staff would change the diaper. N.T. 10/14/10 at 32. Ms. Cleveland observed the deceased had an air mattress to assist her in resting more comfortably, and the deceased did not voice complaints to her regarding the care provided by the nursing home staff. N.T. 10/14/10 at 33–37.

---

**2.** By order entered on September 23, 2008, the trial court granted Episcopal's motion for summary judgment on the basis of the governmental immunity defense; however, the trial court subsequently vacated its order and, after holding the matter under advisement, denied the motion for partial summary judgment on March 9, 2009.

**3.** At trial, the Estate presented the testimony of Edith Cleveland, Robin Kachigian, RN, Kathleen Roach, CNA, Julie McFadden, CNA, Andita Harley, CNA, Anne DeLuca, RN, Olive Christine Williams Brown, RN, and Steven Charles Bowman, MD. Episcopal presented the testimony of Nursing Home Executive Director Mary K. Hess, Nurse Kachigian, Christina Hill, Mary Knapp, RN, Anne Deluca, RN, and Barry M. Fabius, MD.

Robin Kachigian, RN, who was employed in various supervisory positions at the nursing home during much of the deceased's residency, testified that she "almost daily" served as a treatment nurse due to staffing shortages. N.T. 10/14/10 at 50–52. She admitted that, on one occasion, the deceased went to the emergency room suffering from dehydration. N.T. 10/14/10 at 52–53. With regard to charting treatment, Nurse Kachigian indicated that, as soon as medication is given or a treatment is performed, the nurse is to document it. N.T. 10/14/10 at 53–54. If a resident refused medicine or treatment, "[t]he nurse would usually put her initials in the block, put a circle around it, and on the opposite side of the page there are lines for comments, and that's where she would write what—whether or not the resident refused[.]" N.T. 10/14/10 at 54–55. If care is not documented on a chart, then Nurse Kachigian indicated it was considered not to have been done. N.T. 10/14/10 at 55. Nurse Kachigian admitted a skin assessment form dated 3/4/04, which she completed after examining the deceased, revealed the deceased had a stage II wound on her ankle. N.T. 10/14/10 at 56–57. However, notations on a different form for 3/4/04 indicated that, at 10:00 a.m., the deceased's "[s]kin integrity remains uncompromised." N.T. 10/14/10 at 60. Nurse Kachigian admitted she made an error on the latter form. N.T. 10/14/10 at 60. Nurse Kachigian admitted she "is human;" however, she did not admit that she made the mistake because of understaffing, which required her to perform multiple tasks at the nursing home. N.T. 10/14/10 at 61. Nurse Kachigian explained that, unless there is a significant change in a patient's condition, each patient generally has a quarterly care plan during which treatment is reviewed. N.T. 10/14/10 at 65–67.

Nurse Kachigian testified that, during the month of September of 2003, and some portion of October of 2003, there was no manager for West 1, which is the first floor of the nursing home where the deceased resided. N.T. 10/14/10 68–70. Nurse Kachigian admitted a weekly nursing note from 9/4/03 indicated the deceased "[o]ften cries out to remove splints [from] lower extremities." N.T. 10/14/10 at 72. The weekly nursing note from 9/11/03 indicated the deceased often "screams out with [use of] restorative ... splints [on] lower extremities." N.T. 10/14/10 at 73. The weekly nursing note from 9/19/03 indicated restorative care with splints was being used on the deceased, who "screams when splints are used." N.T. 10/14/10 at 74. The weekly nursing note from 9/25/03 indicated the deceased "screams and hollers when splints are on." N.T. 10/14/10 at 76. The weekly nursing note from 10/8/03 indicated "range of motion and splinting. Episode of screaming." N.T. 10/14/10 at 76–77. The weekly nursing note from 10/30/03 indicated the deceased "often screams" to "have the splints removed" during "restorative range of motion [session]." N.T. 10/14/10 at 77–78. Nurse Kachigian admitted the notes from September of 2003 to October of 2003 did not reveal that the deceased's pain medicine was increased, despite the fact she was crying out in pain during her restorative splint treatments. N.T. 10/14/10 at 78–80. However, in November of 2003, when Nurse Kachigian heard the deceased cry out during restorative care, she ensured that the deceased's pain medication was increased on 11/11/03. N.T. 10/14/10 at 79–80. The weekly nursing note from 11/13/03 indicated the deceased "[d]oes holler out during range of motion and turning. Duragesic has increased [from 25 micrograms] to 50 micrograms on 11/11/03 . . . . Skin assessment done. Some discolored areas and scabs but no break-

down. Continues on restorative nursing for exercises on … leg." N.T. 10/14/10 at 80; N.T. 10/18/10 at 6–7. The weekly nursing note from 11/20/03 indicated the decedent "[d]oes not like legs to be touched. Pain management seems effective." N.T. 10/14/10 at 81. Nurse Kachigian testified the decedent's pain seemed to be managed once the pain medicine, i.e., the Duragesic patch, was increased. N.T. 10/14/10 at 81.

On cross-examination, Nurse Kachigian testified that, in 2003 and 2004, there was "adequate staffing to get the job done" on West 1, the floor where the deceased resided. N.T. 10/14/10 at 14. Nurse Kachigian clarified that the stage II wound on the deceased's ankle, which was documented on the 3/4/04 skin assessment form, was "superficial" and not a pressure sore. N.T. 10/14/10 at 15. Nurse Kachigian testified it was not unusual for a resident to have received care but the nurse forgot to so mark it on the resident's chart. N.T. 10/14/10 at 19–20. Regarding the use of splints on the deceased, Nurse Kachigian indicated the nurses followed the orders of a physician. N.T. 10/14/10 at 25. She testified as follows regarding the administering of pain medicine:

**Q:** Nurse Kachigian, the amount of the dosage for the analgesic Fantanyl, the Duragesic patch, there's been some testimony [it] was one time 25 micrograms, another time 50 micrograms.

Who's making that decision that should be the dosage of the painkillers to give to Sallie Mae Hall?

**A:** The physician will tell you you always start at 25 and work up as needed.

**Q:** And, again, that's a physician's judgment?

**A:** Absolutely. Yes.

N.T. 10/18/10 at 25.

On re-direct examination, Nurse Kachigian admitted the deceased's physician would rely on the nurses to report if the deceased was experiencing pain. N.T. 10/18/10 at 27. Nurse Kachigian admitted that, from September of 2003 until November 11, 2003, the deceased, who was receiving 25 micrograms of the Duragesic patch, "screamed" out in pain during the range of motion exercises, which occurred six days a week. N.T. 10/18/10 at 28–29. The deceased's pain medication was not increased to 50 micrograms of the Duragesic patch until November 11, 2003. N.T. 10/18/10 at 29–30. On November 12, 2003, when the range of motion exercises were performed, there was no note of screaming and, in fact, the weekly nursing note indicated "pain medication effective." N.T. 10/18/10 at 30. Nurse Kachigian denied that the nursing home was ever understaffed. N.T. 10/18/10 at 31.

Kathleen Roach, CNA, testified she worked at the nursing home for periods of time from 2001 to 2004, and on occasion, she worked on West 1, which is the floor where the deceased resided. N.T. 10/18/10 at 39–40. CNA Roach indicated West 1 had an "odor" because it was a critical care unit. N.T. 10/18/10 at 41. CNA Roach testified West 1 was "short" on staffing and so "we really couldn't do the adequate care." N.T. 10/18/10 at 41. She indicated the conditions on West 1 were "really terrible," and, when she was assigned to assist on West 1, she would find "a lot of people that [were] wet, full of urine, feces, throwing up from the feeding tube, the trachs was—stuff was coming out of it, and bandages and stuff wasn't changed." N.T. 10/18/10 at 43. She found the condition of the residents' bed sheets to be "nasty," with the previous shift failing to change the sheets. N.T. 10/18/10 at 45. She observed roaches on the floor. N.T. 10/18/10 at 46. CNA Roach testified the conditions of residents not being changed in a timely manner and roaches being on the floor was

found on all of the floors of the nursing home. N.T. 10/28/10 at 45–46. CNA Roach testified she knows complaints about understaffing were "passed on to management;" but she was not permitted to complain to families or the residents about the understaffing. N.T. 10/18/10 at 47.

On cross-examination, CNA Roach admitted she worked at the nursing home for only two months in 2001 and then she left her employment. N.T. 10/18/10 at 52. CNA Roach returned to the nursing home on September 2, 2003, and worked there until December 19, 2003. N.T. 10/18/10 at 53. CNA Roach clarified that, during her three months of employment in 2003, she worked primarily on the fifth floor, and she was assigned to assist on West 1 on only one occasion. N.T. 10/18/10 at 53.

Julia McFadden, who was a CNA at the nursing home from June 17, 2002 to August 9, 2004, testified she was primarily assigned to the sixth floor; however, due to understaffing, she often worked on other floors of the nursing home. N.T. 10/18/10 at 59–60. CNA McFadden testified the nursing home was "[s]hort staffed all the time." N.T. 10/18/10 at 59. She noted the residents on West 1, such as the deceased, required constant checking and needed to have their diapers changed continuously. N.T. 10/18/10 at 60. She indicated that, because of understaffing, she was tired and unable to give the residents the care they really needed, including changing the residents' diapers in a timely manner. N.T. 10/18/10 at 60–62. When the nursing home was understaffed, she would observe residents with wet diapers and dried fecal matter due to their diapers not being changed in a timely manner. N.T. 10/18/10 at 64–65. CNA McFadden saw mice in the residents' rooms. N.T. 10/18/10 at 66.

On cross-examination, CNA McFadden clarified that, while she was assigned to work on the sixth floor, she was taken off the floor and assigned to work on West 1 when the nursing home was short-staffed. N.T. 10/18/10 at 72. This happened on more than one occasion. N.T. 10/18/10 at 72.

Andita Harley, who was a CNA at the nursing home from 2003 to November of 2004, testified she was originally assigned to the fourth floor but she was later transferred to work on West 1. N.T. 10/18/10 at 87. CNA Harley specifically cared for the deceased. N.T. 10/18/10 at 89. She testified the nursing home was "regularly" short-staffed, which would prevent all of the residents, including the deceased, from having their diapers changed in a timely manner. N.T. 10/18/10 at 90. She noted that, due to short-staffing, she was unable to wash the deceased, "had to rush," and cared for more residents than or which she was supposed to care. N.T. 10/18/10 at 89–90. CNA Harley indicated that "depending on staffing ... [she] encountered double diapers" on the deceased. N.T. 10/18/10 at 89. She explained that "double diapering" includes putting a diaper on the resident, and then folding a towel between the resident's legs. N.T. 10/18/10 at 89. This permitted the CNAs to not change the resident as often without the bed sheets becoming soiled. N.T. 10/18/10 at 89. Despite finding the deceased's diaper having "rings from being saturated [with urine]" and containing dried fecal matter, CNA Harley did not have time to properly clean the deceased with soap and water. N.T. 10/18/10 at 90–91. She observed mice in the residents' rooms. N.T. 10/18/10 at 91. With regard to staffing, CNA Harley testified as follows:

Q: On [the deceased's] floor when the State [inspectors] were in the building, what was the status of staffing on the floor?

**A:** We were staffed.

**Q:** And when the State would leave, how would the staffing be after they left?

**A:** Go back to normal.

**Q:** What was normal

**A:** Short-staffed, make do with what we have.

N.T. 10/18/10 at 92.

On cross-examination, CNA Harley admitted that she was terminated by the nursing home for allegedly verbally abusing a resident; however, she indicated the allegations were false. N.T. 10/18/10 at 96–99.

Anne DeLuca, a registered nurse who was the assistant director of nursing at the nursing home while the deceased was a resident, testified that one of her job duties was to ensure there was sufficient staff to meet the needs of the residents. N.T. 10/18/10 at 7. She testified that, to her knowledge, the nursing home's policies and procedures were in accordance with state and federal regulations governing long-term care. N.T. 10/18/10 at 8. Assistant Director DeLuca indicated she had received complaints from nurses that the nursing home was "short staffed," and she referred those complaints to Midge Mercadante, the director of nursing. N.T. 10/18/10 at 13–14. Assistant Director De-Luca admitted she sat it on meetings with State Department of Health surveyors; however, she did not remember that, on November 12, 2003, the nursing home received a citation for failing to implement and maintain procedures for staff to timely report any changes in a resident's condition. N.T. 10/18/10 at 18–20. She also did not remember that the nursing home received citations on September 17, 2003, and January 8, 2004, for failing to develop plans of care, a citation on August 13, 2004, for failing to maintain a pest free environment, or a citation on October 29, 2004, for failing to maintain complete and accurate documentation. N.T. 10/18/10 at 19–21. Assistant Director DeLuca admitted she had received reports about residents having dried feces on them and not having their wet diapers changed promptly, and she disciplined staff for these failures. N.T. 10/18/10 at 31–33.

On cross-examination, Assistant Director DeLuca indicated that, to her knowledge, in 2003 and 2004, the floor where the deceased resided was not "short staffed." N.T. 10/18/10 at 35. Also, to her knowledge, none of the citations discussed *supra,* or the incidents of dried feces/urine, pertained to the deceased specifically. N.T. 10/18/10 at 35.

At this point, as part of the Estate's case-in-chief, the Estate's counsel read into the record certain admissions, which were made by Director Mercadante and Mary K. Hess, who was the executive director of the nursing home, in unrelated lawsuits. Specifically, Executive Director Hess admitted Episcopal was the party responsible for the full operation and management of the nursing home. N.T. 10/18/10 at 54. She admitted the nurses and clinical staff members are the "eyes and ears" for the physicians. N.T. 10/18/10 at 56–57. Executive Director Hess indicated the nursing home's policy is that a resident is to be bathed twice a week. N.T. 10/18/10 at 64. She did not recall receiving any complaints from any source as to lack of staffing for the nursing home. N.T. 10/18/10 at 64–65. She testified the nursing home's policies and procedures are within the nursing standard of care. N.T. 10/18/10 at 65–66. Executive Director Hess did not remember receiving complaints about an odor of feces and urine on the first floor, where the deceased resided; however, she admitted the first floor of the nursing home had a "mouse situation," which staff diligently

addressed while the deceased was a resident. N.T. 10/18/10 at 67.

Director Mercadante indicated she had never received any complaints of understaffing, and she confirmed a resident is to be immersed in water for a bath twice a week. N.T. 10/18/10 at 69, 73, 81.

Olive Christine Williams Brown, RN, who was presented by the Estate and qualified by the trial court as an expert in the field of geriatric nursing, testified she reviewed materials concerning the care and treatment of the deceased. N.T. 10/19/10 at 25. She discovered Episcopal was the managing company of the nursing home and, therefore, it was responsible for all care provided to the deceased. N.T. 10/19/10 at 25. In reviewing the deceased's records, Nurse Brown discovered an October 29, 2003 assessment meeting report, which indicated the deceased's pain assessment was negative. N.T. 10/19/10 at 44–45. However, Nurse Brown testified this was an inaccurate assessment since the nursing logs revealed the deceased was screaming out in pain from September of 2003 to November of 2003 when the leg splints were being used and range of motion exercises were being conducted. N.T. 10/19/10 at 45–53. Nurse Brown opined that the deceased's pain was not effectively managed from September of 2003 to November of 2003, and Episcopal fell below the standard of care in this regard. N.T. 10/19/10 at 48, 54. Nurse Brown noted the physician's progress report revealed that, from September of 2003 to November 3, 2003, no nurse reported the deceased's screams of pain to the physician. N.T. 10/19/10 at 59–60. She specifically testified as follows:

Based on my review of the record between September and November, consistently the [deceased] continued to complain of pain. Consistently the nursing staff, as I see the record, did not report to the physician the [deceased's] complaints of pain until November, which is two months the [deceased] had been complaining of pain. Pain is subjective, so it is whatever the resident says it is or for however long. If [the] resident says it is. And based on my review of the record she was in pain.

N.T. 10/19/10 at 60.

Nurse Brown indicated the deceased's physician prescribed for the deceased range of motion therapy six times per week, resulting in the deceased receiving such therapy 59 times from September 4 to November 11, 2003. N.T. 10/19/10 at 15. During this time, the deceased was able to make her needs known to the nursing staff, including crying out in pain; however, she had limited mobility and required extensive assistance. N.T. 10/19/10, at 17–16.

Nurse Brown opined that, for the relevant time when the deceased was a resident at the nursing home, the nursing home's documentation of records "fell below the standard of care" as set forth by federal regulations, state regulations, and the medical community. N.T. 10/19/10 at 21–22. She indicated that, if a resident is at the hospital, and the nursing home is charting that they are providing care to the resident in his or her absence, then the documentation falls below the standard of care. N.T. 10/19/10 at 23. On May 27 and 28, 2004, the decedent was in the hospital and not at the nursing home; however, the nursing home's care records indicated the nursing home staff had given the decedent mouth care and washed her twice. N.T. 10/19/10 at 24. Nurse Brown indicated that, since the decedent was in the hospital on these two days, it was impossible for nursing home staff to have completed such tasks. N.T. 10/19/10 at 24–25. Moreover, from June 19, 2004 to June 24, 2004, the decedent was in the hospital and not at the

nursing home; however, the nursing home's care records indicated that, on June 20, 2004, dental mouth care was given to the decedent by nursing home staff, and on June 21, 2004, the nursing home staff had cleaned the decedent's PEG site with soap and water. N.T. 10/19/10 at 25–30. However, Nurse Brown testified that, since the decedent was in the hospital, it was impossible for nursing home staff to have completed such tasks. N.T. 10/19/10 at 29–30. Nurse Brown opined such inaccuracies in the nursing home's care records falls below the acceptable standard of care. N.T. 10/19/10 at 30.

Nurse Brown noted the nursing home's records indicated there were numerous days when the deceased was not given oral hygiene care, nail care, a shower, or incontinence care. N.T. 10/19/10 at 33–76. In fact, the record revealed there were several months when the deceased did not receive any type of bath or shower. N.T. 10/19/10 at 33–76. Nurse Brown noted the deceased suffered from multiple urinary tract infections, which can result from lack of proper incontinence care. N.T. 10/19/10 at 33–76. Nurse Brown opined, to a reasonable degree of professional certainty, that the nursing home's facility administrator, the director of nursing, and Episcopal, which was the managing entity, were negligent in their care and treatment of the deceased. N.T. 10/19/10 at 78–79. She specifically opined their negligence caused the deceased to suffer multiple urinary tract infections. N.T. 10/19/10 at 79. She noted the lack of care provided to the deceased was consistent with the nursing home being understaffed, as testified to by the CNAs. N.T. 10/19/10 at 83–84.

On cross-examination, Nurse Brown admitted that, when the deceased experienced symptoms regarding her urinary tract infections, the nurses properly reported such to the physician, who ordered proper cultures and prescribed antibiotics. N.T. 10/20/10 at 18. However, Nurse Brown noted her criticisms were not related to the treatment of the deceased's urinary tract infections; but rather, the nursing home's failure to prevent the reoccurrence of the multiple urinary tract infections. N.T. 10/20/10 at 19. Nurse Brown admitted her testimony regarding lack of care to the deceased was based on logs and, sometimes, nurses forget to note on logs when care has, in fact, been provided. N.T. 10/20/10 at 28–30. However, Nurse Brown opined the failure to note that care was given falls below the acceptable standard of care. N.T. 10/20/10 at 29–30. Nurse Brown testified there is no record that the deceased, who wore diapers, exhibited any skin infections in her crotch area due to lack of care. N.T. 10/20/10 at 38. Nurse Brown confirmed that she did not perform any staffing analysis in this case regarding the nursing home, and "CNAs always feel as if there isn't enough staff [at a nursing home]." N.T. 10/20/10 at 49, 53.

Steven Charles Bowman, MD, who was offered by the Estate and accepted by the trial court as an expert in internal medicine and gerontology, testified he examined the deceased's medical records. N.T. 10/20/10 at 19. Dr. Bowman noted the deceased, who had suffered a stroke, relied entirely upon the staff of the nursing home for all of her needs and she was at risk for urinary tract infections. N.T. 10/20/10 at 23. Dr. Bowman opined that, in order to prevent urinary tract infections, it is necessary to keep a patient "really clean and hydrated." N.T. 10/20/10 at 24. He further opined, to a reasonable degree of medical certainty, that the nursing home's care logs revealed an "absence of cleanliness," which increased the deceased's risk of developing urinary tract infections. N.T. 10/20/10 at 25–27. He noted the care logs revealed "numerous incidents in which

[the deceased] wasn't bathed, she wasn't washed. She was left to lie in her own filth." N.T. 10/20/10 at 25. He noted this lack of care increased the risk of harm for the deceased to suffer urinary tract infections. N.T. 10/20/10 at 25–26. Dr. Brown opined the deceased suffered "severe pain" from September of 2003 to November of 2003, when nurses assisted the deceased with her range of motion exercises; however, the records revealed that a physician was not notified of the deceased's pain until November 11, 2003. N.T. 10/20/10 at 30–31. Dr. Brown noted the physician's prescription of a larger dose of pain medicine was effective in addressing the deceased's pain. N.T. 10/20/10 at 31.

On cross-examination, Dr. Brown opined the deceased's surviving for eight years and eight months in a nursing home following a stroke was "definitely outside the norms;" however, he opined there was "nothing exceptionally good" about the care given to the deceased from May 17, 2003 until the end of her life. N.T. 10/20/10 at 42, 52.

On re-direct examination, Dr. Brown opined, to a reasonable degree of medical certainty, that Episcopal failed to provide proper care, cleaning and treatment, which increased the risk of harm, i.e., the development of urinary tract infections, to the deceased. N.T. 10/20/10 at 59.

After the Estate rested, Episcopal offered the testimony of Mary K. Hess, who is the Executive Director of the Nursing Home and employed by Episcopal. Executive Director Hess explained the nursing home at issue is the home of last resort for the residents of the City of Philadelphia who require long-term or skilled nursing care. N.T. 10/21/10 at 18. Executive Director Hess testified CNA McFadden never worked on the deceased's unit, which was West 1. N.T. 10/21/10 at 19–20. Executive Director Hess testified that CNA Harley was fired solely for verbally abusing a resident. N.T. 10/21/10 at 20. She indicated that, from May of 2003 to January of 2005, the nursing home met or exceeded the nurse staffing requirements set forth in the Pennsylvania State regulations. N.T. 10/21/10 at 24. For example, she testified the standard state regulatory requirement is 2.7 hours of direct resident care per day and, in the case of West 1 patients, such as the deceased, the average monthly hours of care was 3.9 to 4.46 hours of care per resident per day. N.T. 10/21/10 at 26. She specifically testified that, from 2003 to January of 2005, the nursing home was not understaffed as per the State numerical objective regulations, and the nursing home never received any citations during this time due to staffing level deficiencies. N.T. 10/21/10 at 26–27. Executive Director Hess testified state inspectors conducted surprise inspections, and after each inspection, the inspectors found the nursing home to be compliant with staffing regulations. N.T. 10/21/10 at 28. She acknowledged that the inspections lasted several days; however, she denied increasing staff during or in anticipation of a state inspection. N.T. 10/21/10 at 28–30.

On cross-examination, Executive Director Hess testified that, during all relevant time, the nursing home's policy and procedures were compliant with state and federal regulations. N.T. 10/21/10 at 39. She indicated she was never made aware of any complaints of understaffing at the nursing home; however, she admitted she was aware of "at least one or two cases" where administrators were investigating reports of residents being left in their dried urine and feces. N.T. 10/21/10 at 43, 45, 47. Executive Director Hess admitted that, with regard to charting, if care is not documented, it is assumed to not have been done. N.T. 10/21/10 at 47.

On re-direct examination, Executive Director Hess denied staffing was increased on West 1 during months when state inspectors were at the nursing home. N.T. 10/21/10 at 55. She indicated that, in every case where care has not been documented, that does not mean that the care was not actually done. N.T. 10/21/10 at 56.

Following Executive Director Hess' testimony, Episcopal recalled Nurse Kachigian to the stand. Nurse Kachigian indicated she began as the West 1 unit manager and care coordinator in October of 2003, and she knew the deceased very well. N.T. 10/21/10 at 11. She testified the nursing home's protocol was for the deceased's diaper to be changed every two hours and this protocol was followed as to the deceased. N.T. 10/21/10 at 11. She denied the deceased was ever "double diapered" or left to sit in her own waste for any extended period of time. N.T. 10/21/10 at 12. Nurse Kachigian testified the deceased was to receive a bath or shower every Monday and Thursday; however, sometimes the deceased, who did not like to bathe, would refuse to take a bath or shower. N.T. 10/21/10 at 14–15. In such a case, she would be given a "bed bath." N.T. 10/21/10 at 15. She indicated the deceased received her regularly scheduled incontinence care; however, she admitted she was sent to the hospital two or three times for a urinary tract infection. N.T. 10/21/10 at 19. Nurse Kachigian opined that the deceased "yelled and screamed" as a form of communication and not necessarily because she was in pain. N.T. 10/21/10 at 23. The deceased exhibited a "sad" mood often due to lack of family visits and, in return, the nursing home staff would hold her hand to comfort her. N.T. 10/21/10 at 30–32. Nurse Kachigian denied there were ever any mice or other pests in the deceased's room. N.T. 10/21/10 at 43.

On cross-examination, Nurse Kachigian admitted that state inspectors cited the nursing home for mice in the building. N.T. 10/21/10 at 46. Regarding the deceased's screaming during her range of motion exercises from September of 2003 to November of 2003, Nurse Kachigian testified the deceased was not screaming due to pain. N.T. 10/21/10 at 54, 57. She testified the deceased "hollered all the time" and not due to pain. N.T. 10/21/10 at 59. She opined the physician increased the deceased's pain medication in November of 2003 because, in late October of 2003, the deceased most likely told her or another staff member that she was feeling pain. N.T. 10/21/10 at 58.

Christina Hill, who was assigned as a social worker to the deceased while she was a resident at the nursing home, testified the deceased was depressed. N.T. 10/22/10 at 6. She testified the deceased's family members "very infrequently" attended quarterly care conferences; however, when they did so, they were complimentary of the care given to the deceased. N.T. 10/22/10 at 10–13.

Mary Knapp, RN, who was offered by Episcopal and accepted by the trial court as an expert in the field of geriatric nursing and nursing home administration, opined the nursing home met the standard of care with regard to the deceased. N.T. 10/22/10 at 59. She indicated the deceased's urinary tract infections were "unavoidable" and the nursing staff responded appropriately to her condition. N.T. 10/22/10 at 59. She opined the provisions of medication and restorative care given to the deceased met the standard of care for pain management. N.T. 10/22/10 at 68. She noted that, while it is not a good practice, it is not uncommon for caregivers to neglect to mark on a chart when care has been given. N.T. 10/22/10 at 70–71. Nurse Knapp testified there was no indica-

tion of understaffing at the nursing home. N.T. 10/22/10 at 72–73.

Following Nurse Knapp's testimony, Episcopal recalled Anne DeLuca, RN, the Assistant Director of Nursing, to the stand. Nurse DeLuca testified the deceased was resistant to restorative care, which is used for pain management. N.T. 10/25/10 at 9–10.

Barry M. Fabius, MD, who was offered by Episcopal and accepted by the trial court as an expert in geriatric medicine, opined to a reasonable degree of medical certainty that the nursing home met or exceeded the standard of care with regard to the deceased. N.T. 10/25/10 at 44. Dr. Fabius further opined Episcopal met the standard of care for medical management of pain in a nursing home in terms of monitoring and treating the deceased's pain. N.T. 10/25/10 at 56, 67. Dr. Fabius testified the number of urinary tract infections, which the deceased suffered, was not uncommon given the deceased's medical condition and could not be prevented even "with the best hygiene and care." N.T. 10/25/10 at 67–68. Dr. Fabius opined the nursing home provided to the deceased good incontinence care, and it is insignificant that the CNAs may have forgotten to mark every time they gave care to the deceased. N.T. 10/25/10 at 72–74. He opined the quality of care received by the deceased during the last twenty months of her life was "excellent." N.T. 10/25/10 at 75.

On cross-examination, Dr. Fabius reiterated that the deceased's multiple urinary tract infections were unavoidable. N.T. 10/25/10 at 84. Dr. Fabius testified that the deceased's screaming did not necessarily mean she was in pain. N.T. 10/25/10 at 98–100, 109.

At the conclusion of all evidence, the jury found Episcopal liable for the negligent care of the deceased and awarded the Estate compensatory damages in the amount of $119,000.00. Both Episcopal and the Estate filed post-trial motions, which the trial court denied in their entirety following a hearing. However, the trial court molded the jury's verdict to include delay damages, and on February 18, 2011, judgment was entered in favor of the Estate in the amount of $154,902.98. The Estate filed a timely notice of appeal, and Episcopal filed a timely cross-appeal. Both parties filed timely court-ordered Pa. R.A.P. 1925(b) statements, and the trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

 We begin with the claims presented by the Estate on appeal. The Estate's first claim is the trial court erred in granting Episcopal's motion for a directed verdict with regard to the Estate's claim for punitive damages.[4] The Estate specifically argues that, viewing the evidence in the light most favorable to the Estate, the Estate set forth sufficient facts for the jury to conclude Episcopal acted in an outrageous fashion with a reckless indifference to the rights of the deceased. In this regard, the Estate contends it presented evidence of understaffing, falsification of

---

**4.** We note that, at the close of the Estate's case-in-chief, Episcopal moved for a compulsory non-suit on the basis the Estate did not set forth a *prima facie* case for punitive damages. *See* N.T. 10/20/10 at 67. After hearing argument on the motion, the trial court denied the motion for a compulsory non-suit. *See* N.T. 10/20/10 at 74. However, at the close of Episcopal's case, Episcopal moved for a directed verdict on the issue of punitive damages, and the trial court granted the motion for a directed verdict. N.T. 10/26/10 at 106. Specifically, the trial court judge indicated, "I don't think that it is reasonable for the jury to consider, to conclude intentional, malicious, outrageous or intentional disregard." N.T. 10/26/10 at 106.

records, substandard facility conditions, and improper treatment of the deceased's pain, all of which Episcopal failed to correct despite knowledge of such.

In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in the light most favorable to the verdict winner. Our standard[s] of review when considering the motions for a directed verdict and judgment notwithstanding the verdict [JNOV] are identical. We will reverse a trial court's grant or denial of a [directed verdict or JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

There are two bases upon which a [directed verdict or JNOV] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Campisi v. Acme Markets, Inc.*, 915 A.2d 117, 119 (Pa.Super.2006) (quotation omitted). *See Berg v. Nationwide Mutual Insurance Co., Inc.*, 44 A.3d 1164 (Pa.Super.2012).

With regard to the standards, which the courts are to utilize in determining whether the issue of punitive damages should be submitted to the jury, we note the following:

[P]unitive damages are an 'extreme remedy' available only in the most exceptional circumstances.

Additionally, [p]unitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others. A defendant acts recklessly when his conduct creates an unreasonable risk of physical harm to another and such risk is substantially greater than that which is necessary to make his conduct negligent. Thus, a showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed. Rather, the plaintiff must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to intentional, willful, wanton or reckless conduct[.]

Initially, the court must determine whether the plaintiff has presented sufficient evidence to support a punitive damage award before submitting the issue of such damages to the jury.

*Doe v. Wyoming Valley Health Care System, Inc.*, 987 A.2d 758, 768 (Pa.Super.2009), *appeal granted in part*, 607 Pa. 326, 6 A.3d 500 (2010).

In arguing the issue of punitive damages should have been submitted to the jury, the Estate specifically argues this case is controlled by *Scampone v. Grane Healthcare Co.*, 11 A.3d 967 (Pa.Super.2010), *appeal granted*, 609 Pa. 264, 15 A.3d 427 (2011). In *Scampone*, the plaintiff-decedent was living in a nursing home, and in December of 2003, she was diagnosed with a urinary tract infection. *Id.* at 971. The plaintiff-decedent was hospitalized, treat-

ed, and returned to the nursing home in good condition. *Id.* The following month, she was re-admitted with another urinary tract infection, as well as dehydration, malnutrition, and bed sores. *Id.* On February 9, 2004, the plaintiff-decedent died of a heart attack at the age of 94. *Id.* The plaintiff-estate instituted an action against the nursing home and, at trial, the trial court concluded the evidence was insufficient to submit the question of punitive damages to the jury. *Id.* On appeal to this Court, the plaintiff-estate argued the trial court erred in failing to submit the issue of punitive damages to the jury and, in agreeing, a panel of this Court stated, in relevant part, the following:

We conclude that Plaintiff's evidence established that both Highland and Grane [5] acted with reckless disregard to the right of others and created an unreasonable risk of physical harm to the residents of the nursing home. The record was replete with evidence that the facility was chronically understaffed and complaints from staff continually went unheeded. Grane and Highland employees not only were aware of the understaffing that was leading to improper patient care, they deliberately altered records to hide that substandard care by altering ADLs [6] that actually established certain care was not rendered. Records concerning the administration of medications were falsified. Staffing levels were increased during state inspections and then reduced after the inspection was concluded. Deliberately altering patient records to show care was rendered that was actually not is outrageous and warrants submission of the question of punitive damages to the jury. Other evidence supporting an award of punitive damages included [the plaintiff-

decedent's] lack of nursing care for a critical nineteen days prior to her death and her deplorable condition on January 30, 2004. We also point to a note in her records that the poor woman was crying for water.

\* \* \*

Highland further argues that it cannot be subject to punitive damages because its challenged conduct was unrelated to [the plaintiff-decedent] and solely involved other patients. We reject this argument. The evidence in question related to all residents of Highland; [the plaintiff-decedent] was clearly a resident of Highland during the time covered by these witnesses. In addition, as analyzed above, the effects of understaffing was specifically connected to [the plaintiff-decedent's] care.

For the foregoing reasons, we reverse . . . the trial court's refusal to submit to the jury the question of whether an award of punitive damages was appropriate.

*Scampone*, 11 A.3d at 991–992 (footnotes added).

 Similar to *Scampone*, we conclude the trial court erred in granting Episcopal's motion for a directed verdict, thus failing to submit the issue of punitive damages to the jury. Viewing the evidence in the light most favorable to the Estate, and accepting as true all evidence which supports the Estate's claim for punitive damages, as we must under our standard of review, *Campisi, supra,* we conclude the Estate presented evidence establishing Episcopal acted in an outrageous fashion in reckless disregard to the rights of others and created an unreasonable risk of physical harm to the residents of the nurs-

---

**5.** Highland was the nursing home facility, and Grane managed the nursing home.

**6.** ADLs are care charts, which CNAs were required to complete in *Scampone.*

ing home, particularly the deceased. *See Scampone, supra.* For instance, the record was replete with evidence that the nursing home was chronically understaffed and complaints from the staff went unheeded. The Estate presented evidence Episcopal employees were not only aware of the understaffing, which led to improper patient care, but they deliberately increased staff during times of state inspections and then reduced such after the inspection was concluded. Additionally, the Estate presented ample evidence that the deceased continuously cried out in pain from September of 2003 to November of 2003 when nurses assisted her with range of motion exercises and applied splints to her legs; however, the staff completely disregarded her severe pain. Furthermore, the Estate presented evidence that nurses falsified care logs, thus indicating the deceased had received care at the nursing home when, in fact, the deceased was admitted into the hospital. We also point to evidence revealing there were entire months when the deceased was not given a bath and, to quote Dr. Bowman "[the deceased] was left to lie in her own filth." N.T. 10/20/10 at 25.

Based on the aforementioned, we conclude the trial court erred in refusing to submit to the jury the question of whether an award of punitive damages was appro-

priate. *Scampone, supra.* We are simply not persuaded by the trial court's conclusion that "[p]unitive damages are not warranted as [Episcopal's] negligence did not rise to the level of reckless disregard." Trial Court Opinion filed 10/6/11 at 30. Rather, we conclude the Estate set forth sufficient evidence, which, if believed by the jury, would rise to the level of reckless disregard as set forth by *Scampone.* Thus, we reverse as to the issue of punitive damages and remand for a new trial on this issue only.

The Estate's second issue is the trial court erred in prohibiting the Estate from presenting certain evidence and testimony, which would have further supported the Estate's claim for punitive damages. Specifically, set forth as sub-issues, the Estate contends the trial court erred in (1) precluding the testimony of Joan Wood Barnes, (2) limiting the testimony of Dr. Bowman and Nurse Brown, and (3) failing to require Episcopal to produce its employee personnel files, or alternatively, permitting Episcopal to use information from the files to impeach the Estate's witnesses.[7] However, at the outset of its second appellate argument, the Estate specifically indicates that this Court need not review the second issue, or any of its sub-issues, if we determine the trial court

---

7. To the extent the Estate intended the issue concerning the employee personnel files to be raised as a separate issue, and not as a sub-issue of the second issue, we find it to be waived since it was not presented in the Estate's "Statement of Questions Presented." Pa. R.A.P. 2116(a). Furthermore, the "gist" of the Estate's claim is that it is entitled to have Episcopal produce 42 requested personnel files pursuant to *Heck v. Episcopal Long Term Care,* No. 1576 EDA 2008 (Pa.Super. filed 2/23/10) (unpublished memorandum), *appeal denied,* 606 Pa. 695, 998 A.2d 960 (2010). However, *Heck* is an unpublished memorandum from a three-judge panel, which has no binding authority. *See Com-*

*monwealth v. Phinn,* 761 A.2d 176 (Pa.Super.2000). In any event, contrary to the Estate's assertion, in *Heck,* this Court did not reverse the trial court's ruling in *Heck* as it related to the discovery of employee personnel files. Rather, in *Heck,* this Court reversed and ordered a new trial on the basis Episcopal's counsel made prejudicial, reversible comments during his closing argument. In *dicta,* this Court noted that "we are without the benefit of a writing prepared by the discovery court in supports of its decision to deny Appellants' discovery request [for the personnel files]," *Id.* at 15, and suggested, upon remand, the trial court should explain its ruling.

erred in granting a directed verdict as to the Estate's punitive damages claim based on the evidence introduced at the trial. *See* The Estate's Brief (Brief for Appellant/Cross–Appellee) at 51; The Estate's Reply Brief at 43. That is, in its brief, the Estate has indicated, in relevant part, the following:

> If this Court concludes that [the Estate's] claim for punitive damages was wrongfully dismissed based on the evidence and testimony presented at trial, then this [second] issue will become moot.

The Estate's Brief (Brief for Appellant/Cross–Appellee) at 51.

Inasmuch as the Estate invites us to review its second issue only if we find no merit to the Estate's first issue, and having found the Estate is entitled to relief on its first issue, we decline to address the merits of its second issue.

The Estate's third issue is the trial court erred in granting Episcopal's motion for partial summary judgment based on the statute of limitations, thus preventing the Estate from seeking damages for any negligent acts committed by Episcopal prior to May 17, 2003.[8] The Estate's fourth issue is the trial court erred when it permitted Episcopal to present in its amended answer with new matter the defense of governmental immunity.[9] However, the Estate specifically indicates in its "Statement of the Questions Presented" and argument portion of its brief that it is presenting these claims as "precautionary issues," to be fully examined by this Court only in the event we reverse or otherwise disturb the Estate's award of compensatory damages upon review of Episcopal's cross-appellate claims. *See* The Estate's Brief (Brief for Appellant/Cross–Appellee) at 9, 68; The Estate's Reply Brief at 47. As will be discussed *infra*, we have not disturbed the

---

**8.** The Estate contends the "continuing tort rule" and the "discovery rule" tolled the statute of limitations, thus permitting the Estate to seek damages for negligent acts occurring prior to May 17, 2003. Regarding the Estate's "continuing tort rule" claim, we note the Estate has cited no binding authority or precedential cases on point, and to the extent the Estate would have us extend these nonbinding authorities to this case, we decline to do so based on the argument presented. Regarding the Estate's "discovery rule" claim, while the Estate devotes a substantial portion of its argument explaining why, pursuant to *Fine v. Checcio, D.D.S.*, 582 Pa. 253, 870 A.2d 850 (2005), the trial court should have concluded there was a genuine issue of material fact as to whether the deceased exercised "reasonable diligence" in light of her physical and mental infirmity, the Estate has failed to identify precisely what alleged "latent injuries" or "injuries of unknown etiology" the deceased allegedly suffered prior to May 17, 2003. *See Wilson v. El–Daief*, 600 Pa. 161, 165, 964 A.2d 354, 356 (2009) (indicating the discovery rule tolls the statute of limitations "for latent injuries, or injuries of unknown etiology, until the plaintiff knew or should

have known she was injured by the conduct of another."). In fact, aside from stating generally the deceased suffered "neglect" prior to May 17, 2003, the Estate has set forth no specific incident or types of injury for which it was unable to seek compensatory damages. *See Dalrymple v. Brown*, 549 Pa. 217, 701 A.2d 164, 170 (1997) ("The very essence of the discovery rule ... is that it applies only to those situations where the nature of the injury itself is such that no amount of vigilance will enable the plaintiff to detect an injury.").

**9.** As the Estate recognizes, in response to a motion for summary judgment filed by Episcopal, the trial court subsequently ruled that Episcopal was not entitled to the governmental immunity defense. Thus, the Estate has not shown any prejudice with regard to the trial court's initial ruling, which permitted Episcopal to present the issue in its answer with new matter. *See Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145 (Pa.Super.2012) (in determining whether a new trial is warranted, the appellate court must determine whether the trial court's erroneous ruling prejudiced the appellant).

compensatory damages, which were awarded to the Estate, and therefore, upon suggestion of the Estate, we find it unnecessary to discuss these issues further.

We shall now turn to the issues presented by Episcopal in its cross-appeal. Episcopal's first argument is the trial court erred in denying its motion for a directed verdict, which Episcopal made at the close of all evidence, on the basis the Estate presented no evidence of June Hall's capacity to sue.

The capacity to sue, which relates to standing, "may be waived by a party if not objected to at the earliest possible opportunity." *In re Estate of Brown*, 30 A.3d 1200, 1204 (Pa.Super.2011) (quotation, quotation marks, and footnote omitted). In fact, in an estate case, this Court has specifically held that "[c]hallenges to a litigant's capacity to sue must be raised by way of preliminary objections or answer." *In re Estate of Alexander*, 758 A.2d 182, 189 (Pa.Super.2000) (citation omitted). Here, Episcopal specifically challenged June Hall's capacity to sue for the first time in an oral motion for a directed verdict at the close of all evidence. N.T. 10/26/10 at 62–65. Thus, we find Episcopal's challenge to standing waived on this basis. *See In re Estate of Alexander, supra*.

In any event, we note that, at trial, in arguing its motion for a directed verdict based on an alleged lack of standing, Episcopal's counsel argued the Estate presented no evidence establishing June Hall's capacity to sue. N.T. 10/26/10 at 62–63. In response, the Estate's counsel indicated Edith Cleveland's testimony sufficiently established June Hall's capacity as administratrix of the deceased's estate. N.T. 10/26/10 at 64. Episcopal's counsel indicated, in relevant part, "if that's in evidence, I missed it. I'll go by Your Honor's

memory." N.T. 10/26/10 at 64. The Estate's counsel offered to "go back and pull" the relevant testimony. N.T. 10/26/10 at 65. The trial court indicated it had a notation of such testimony given on October 14, and at that point, Episcopal's counsel deferred to the trial court's recollection. N.T. 10/26/10 at 65. Thus, to the extent Episcopal now argues Edith Cleveland's testimony did not sufficiently establish June Hall's capacity to sue as administratrix of the deceased's estate, we find the issue to be waived on this basis as well.

Episcopal's second argument is the trial court should have granted its motion for a directed verdict or JNOV on all claims of corporate negligence since there was no evidence presented of "understaffing" at the nursing home or of the deceased suffering any harm due to the staffing levels on West 1. N.T. 10/26/10 at 65–76. That is, Episcopal contends that, considering the evidence in the light most favorable to the Estate, and deciding all factual inferences adversely to Episcopal, the evidence is such that no two reasonable minds could differ that judgment should be rendered in favor of Episcopal regarding the Estate's claim for corporate negligence. *See Campisi, supra* (indicating standards to be applied in determining whether the trial court abused its discretion in denying motion for a directed verdict or JNOV).

Initially, we note that, in *Scampone, supra*, this Court recently held that a claim for corporate negligence may be properly asserted against a nursing home. Specifically, we stated the following:

> We conclude that a nursing home is analogous to a hospital in the level of its involvement in a patient's overall health care. Except for the hiring of doctors, a nursing home provides comprehensive and continual physical care for its patients. A nursing home is akin to a

hospital rather than a physician's office, and, [thus,] the doctrine of corporate liability was appropriately applied in this case [to the nursing home facility]. Plaintiff's decedent was a full-time resident of the nursing home, and with the exception of occasional visits from her own doctor, [the nursing home facility] oversaw her care twenty-four hours a day, seven days a week. . . . Clearly, the degree of involvement in the care of patients of skilled nursing home facilities is markedly similar to that of a hospital and bears little resemblance to the sporadic care offered on an out-patient basis in a physician's office. Hence, we hold that the trial court correctly concluded a nursing home could be found liable under a corporate negligence theory.

*Scampone,* 11 A.3d 967, 976 (Pa.Super.2010).

Additionally, pursuant to Pennsylvania law with regard to the vicarious liability of an employer for the acts of its employees, we held in *Scampone* that corporate negligence is a basis for liability as a cause of action against the entity, which manages the operation of the nursing home. *Scampone, supra.*

In the case *sub judice,* similar to the situation in *Scampone,* the deceased was a full-time resident of the skilled nursing home and the degree of care offered to her was markedly similar to that of a hospital. Moreover, Episcopal was the entity, which managed all aspects of the operation of the nursing home, and therefore, the Estate properly brought a survival claim for corporate negligence against Episcopal.

■■■ Regarding whether sufficient evidence of understaffing, which would support a claim of corporate negligence under *Scampone,*[10] was presented in this case such that the trial court properly denied Episcopal's motion for a directed verdict and JNOV, we conclude that such evidence was presented.

In the case *sub judice,* as indicated *supra,* the record was replete with evidence that the nursing home was chronically understaffed, management was aware of the understaffing, and patients, including the deceased, received improper patient care due to the inadequate staffing levels. That is, the evidence supported the conclusion Episcopal had actual or constructive knowledge of the understaffing, which created harm to the deceased, and this negligence was a substantial factor in bringing about harm to the deceased. *Scampone, supra.*

■■■ To the extent Episcopal contends the testimony of CNAs Roach, McFadden, and Harley was incredible since they are "disgruntled former employees" offering "mere lay opinions," under our standard of review, we must accept the witnesses' testimony as credible. *See Scampone, supra; Am. Future Sys. v. Better Business Bureau,* 872 A.2d 1202, 1215 (Pa.Super.2005) ("Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV.") (citations omitted). Furthermore, we disagree with Episcopal that the fact state inspectors never cited

---

**10.** In *Scampone,* this Court concluded that the duty to properly staff a nursing home is owed by the nursing home, as well as the nursing home's managing entity. Additionally, to hold the managing entity liable for corporate negligence, the plaintiff must show the managing entity had actual or constructive knowledge of the understaffing and that the understaffing was a substantial factor in bringing about harm. *Scampone, supra.*

the nursing home for any understaffing violation is dispositive. As indicated *supra*, the Estate offered testimony that, during the course of the multi-day state inspections, the nursing home increased staff, and then decreased staff after the inspection was concluded. Under our standard of review, we must accept this testimony as credible. *See Scampone, supra; Am. Future Sys., supra*. Additionally, expert witnesses Nurse Brown and Dr. Bowman opined, to a reasonable degree of medical certainty, that the nursing home's various short-comings, including failing to effectively manage the deceased's pain, failing to keep her clean, failing to prevent her reoccurring urinary tract infections, and numerous charting errors fell below the acceptable standard of care and the deviation from the standard of care caused harm to the deceased. In fact, expert witness Nurse Brown specifically opined to a reasonable degree of certainty that the nursing home's numerous failures were consistent with the nursing home being understaffed, as was testified to by the CNAs. Finally, Episcopal proffers that its lay and expert witnesses offered reliable and credible testimony concerning the adequate staffing of the nursing home; however, as indicated *supra*, it was within the province of the jury to determine the weight accorded to this testimony. *Am. Future Sys., supra*. Thus, we reject Episcopal's claim that a corporate negligence cause of action against it was not sustained by the evidence. *Scampone, supra*.

Episcopal's final argument is the trial court should have granted its motion for a directed verdict or JNOV on the remaining theories of individual negligence, including the alleged failure to provide the deceased with proper pain medication during restorative care and preventing the deceased's reoccurring urinary tract infections.

With regard to Episcopal's liability for the deceased not being provided with proper pain medication from September of 2003 to November 11, 2003, Episcopal contends there is no "factual evidence ....that the [deceased] screamed in pain from the administration of her prescribed restorative care[.]" Episcopal's Brief (Brief for Appellee/Cross–Appellant) at 37. Thus, Episcopal concludes "there was no evidence at trial of any failure or negligence on the part of the nursing staff in the administration of restorative care or pain medications prescribed." Episcopal's Brief (Brief for Appellee/Cross–Appellant) at 40.

■ Viewing the evidence in the light most favorable to the Estate, as we must under our standard of review, *Campisi, supra*, we conclude the evidence sufficiently established that the deceased suffered pain from September of 2003 to November 11, 2003 when she was being given restorative care. Ms. Cleveland testified that, when she observed the nurses assisting the deceased with passive range motion exercises, the deceased "would yell and scream." N.T. 10/14/10 at 24. Additionally, Nurse Kachigian admitted nursing notes from 9/4/03, 9/11/03, 9/19/03, 9/25/03, 10/8/03, and 10/30/03 revealed the deceased was "screaming" and "hollering" when the nurses applied leg splints and assisted the deceased with range of motion exercises. When Nurse Kachigian heard the deceased cry out on November 11, 2003, she informed the physician, who in turn increased the deceased's pain medication. N.T. 10/14/10 at 78–80. Thereafter, the nursing note from 11/13/03 indicated the deceased did not "holler out" or scream during the range of motion exercises, and the nursing note from 11/20/03 indicated the deceased's "pain management seems effective." N.T. 10/14/10 at 81. Additionally, Nurse Brown opined that the nursing

logs' reports of the deceased screaming was consistent with the deceased suffering pain, which was not effectively managed from September of 2003 to November 11, 2003.

Certainly, based on the aforementioned, the jury was free to conclude that the deceased was "hollering" and "screaming" from September 4, 2003 to November 11, 2003 because of pain, which was alleviated when her medicine was increased on November 11, 2003. We find unavailing Episcopal's contention that the evidence solely reveals the deceased "hollered" and "screamed" as a form of communication. Simply put, the reason for the deceased's screams was within the province of the jury. *See Am. Future Sys., supra.*

■ Episcopal next contends that, even assuming the deceased suffered pain from September of 2003 to November 11, 2003 during her restorative care, there is no evidence any Episcopal employee was negligent in this regard. We disagree.

■ Episcopal, as the managing entity of the nursing home, could be held vicariously liable for the negligent acts of its employees, which caused harm to the deceased, provided such acts were committed during the course of and within the scope of the employment. *Scampone, supra.* Thus, Episcopal is "subject to vicarious liability for the acts and omissions of its agents regarding the quality of care rendered to patients at [the nursing home]." *Id.* at 989. Here, Episcopal is subject to vicarious liability for the acts and omissions of the RNs and CNAs since Episcopal was responsible for the full operation and management of the nursing home. *See id.*

With regard to the RNs and CNAs failure with regard to the managing of the deceased's pain from September of 2003 to November 11, 2003, the record establishes that the nurses are the "eyes and ears" for the physicians at a nursing home. N.T. 10/18/10 at 56–57. In this regard, physicians rely on RNs and CNAs to report if a resident is experiencing pain, particularly during restorative care. N.T. 10/18/10 at 27. The inference in this case is that the RNs and CNAs observed the deceased screaming during such restorative care, but failed to so inform the physician. In fact, Nurse Brown testified her review of the physician's progress report revealed that no nurse reported the deceased's screams to the physician from September of 2003 to early November of 2003. N.T. 10/19/10 at 59–60. When a nurse finally reported the deceased's screams to a physician in early November of 2003, the physician increased the deceased's pain medication, which the logs noted as being effective in managing the deceased's pain. Thus, we conclude the trial court properly denied Episcopal's motions for a directed verdict and JNOV as it pertains to its vicarious liability for the nurses' failure to report to the physician that the deceased was suffering pain during her restorative care from September of 2003 to November of 2003.

■ With regard to Episcopal's liability for the deceased suffering reoccurring urinary tract infections due to improper cleanliness, Episcopal contends there was "no factual evidence of actual failure of caregiving in these areas." Episcopal's Brief (Brief for Appellee/Cross–Appellant) at 44 (emphasis omitted). That is, Episcopal contends there is "no evidence of any negligence or failure of actual caregiving by [the nursing home] staff in the area of bathing, [and] incontinence care[.]" Episcopal's Brief (Brief for Appellee/Cross–Appellant) at 47.

Viewing the evidence in the light most favorable to the Estate, as we must under our standard of review, *Campisi, supra,*

we conclude the evidence sufficiently established the deceased was subjected to repeated periods of uncleanliness, including lack of bathing and being left for extended periods of time in a soiled diaper. For instance, Nurse Kachigian testified that, if care is not documented on the resident's chart, then it is considered to not have been given. Nurse Brown testified there were entire months when the care logs contained no notation indicating the deceased had received any type of a bath or shower. Also, the deceased's care logs revealed numerous days with no notation that the deceased had been given any incontinence care. Nurse Brown opined, to a reasonable degree of nursing certainty, that the lack of proper hygiene "resulted in the harm causing ... urinary tract infections."[11] N.T. 10/19/10 at 79. Moreover, Dr. Bowman opined, to a reasonable degree of medical certainty, that the deceased's care logs revealed an "absence of cleanliness," which increased the deceased's risk of developing urinary tract infections. N.T. 10/20/10 at 25–27. He noted the care logs revealed "numerous incidents in which [the deceased] wasn't bathed, she wasn't washed. She was left to lie in her own filth." N.T. 10/20/10 at 25.

Additionally, CNA Roach testified the conditions on West 1 were "really terrible" and the residents' bed sheets were "nasty" from residents not being changed in a timely manner. CNA Harley testified she cared specifically for the deceased. She observed times when the deceased's diaper was not changed in a timely manner and she did not have time to wash the deceased. She found the deceased's diaper having rings from being saturated with urine and containing dried fecal matter.

Based on the aforementioned, there was sufficient evidence for the jury to conclude that the nursing staff was negligent in the area of bathing and incontinence care. To the extent Episcopal argues the nurses actually gave the necessary care, but forgot to log such on the charts, and the deceased's urinary tract infections were "unavoidable," the jury was free to weigh the testimony and find in the Estate's favor. *See Am. Future Sys., supra.*

Episcopal next contends that, even assuming the deceased was subjected to repeated periods of uncleanliness and incontinence care, there is no evidence any Episcopal employee was negligent in this regard. We disagree.

As indicated *supra*, Episcopal, as the managing entity of the nursing home, is subject to vicarious liability for the acts and omissions of the RNs and CNAs since Episcopal was responsible for the full operation and management of the nursing home. *See Scampone, supra.* Thus, since the RNs and CNAs were responsible for keeping the deceased clean, including changing her diaper in a timely manner, Episcopal is variously liable for their failure to do so.

For all of the foregoing reasons, we affirm the judgment as it relates to the jury's award of compensatory damages, but reverse and remand for further proceedings as to punitive damages.

Affirmed in part; Reversed and Remanded in part; Jurisdiction relinquished.

---

11. To the extent Episcopal contends the jury should have believed the testimony of Episcopal's witness, Dr. Fabius, and not the testimony of Nurse Brown, on this matter, we note the jury was free to weigh the testimony and resolve any conflicts with regard thereto. *See Am. Future Sys., supra.*