Michael EGAN, Jr. and Jill Egan,
h/w and Mark Buzby

v.

USI MID–ATLANTIC, INC. and USI Holdings Corporation and Bristol Township and Zurich American Insurance Company.

Michael Egan, Jr. and Jill Egan,
h/w and Mark Buzby

v.

USI Mid–Atlantic, Inc. and Robert Brown and Freda Batipps and Linda Magovern and Douglas Schroer and Lisa McKernan and USI Holdings Corporation and Suzanne Newsome

v.

Bristol Township.

Appeal of USI Mid–Atlantic Inc., USI Holdings Corporation, Freda Batipps, Robert Brown and Linda Magovern.

Michael Egan, Jr. and Jill Egan,
h/w and Mark Buzby

v.

USI Mid–Atlantic, Inc. and USI Holdings Corporation and Bristol Township and Zurich American Insurance Company.

Michael Egan, Jr. and Jill Egan,
h/w and Mark Buzby

v.

USI Mid–Atlantic, Inc. and Robert Brown and Freda Batipps and Linda Magovern and Douglas Schroer and Lisa McKernan and USI Holdings Corporation and Suzanne Newsome

v.

Bristol Township.

Appeal of USI Mid–Atlantic Inc., USI Holdings Corporation, Freda Batipps, Robert Brown and Linda Magovern.

Michael Egan, Jr. and Jill Egan,

h/w and Mark Buzby

v.

USI Mid–Atlantic, Inc. and USI Holdings Corporation and Bristol Township and Zurich American Insurance Company.

Michael Egan, Jr. and Jill Egan,
h/w and Mark Buzby

v.

USI Mid–Atlantic, Inc. and Robert Brown and Freda Batipps and Linda Magovern and Douglas Schroer and Lisa McKernan and USI Holdings Corporation and Suzanne Newsome

v.

Bristol Township.

Superior Court of Pennsylvania.

Argued July 23, 2013.

Filed April 2, 2014.

Reargument Denied June 11, 2014.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

Andrew F. Susko, Philadelphia, for appellant.

Gerald A. McHugh, Jr., Philadelphia, for Buzby, appellee.

BEFORE: BENDER, J., GANTMAN, J., and PANELLA, J.

OPINION BY BENDER, J.:

USI Mid–Atlantic, Inc., USI Holding Corporation, Freda Batipps, Robert Brown, and Linda Magovern ("Appel-

**1.** Zurich American Insurance Company, the issuer of the commercial fleet automobile insurance policy, is not a party to this appeal.

**2.** On April 30, 2012, this Court issued a rule to show cause why this case should not be transferred to Commonwealth Court based on the inclusion of Bristol Township as a party in the case caption. Appellants responded that Bristol Township was dismissed by court order in July of 2008, and that no party subsequently moved to rejoin Bristol Township. Appellants' Letter, 5/10/12. In Appellees' response, they conceded that Bristol Township was dismissed. Appellees' Letter, 5/14/12. Thus, the parties agree that this Court properly has jurisdiction.

**3.** On November 2, 2012, this Court issued a rule to show cause why the appeal at Docket No. 2334 EDA 2012 should not be dismissed. This Court observed that the appeals at 2334 EDA 2012 and 2109 EDA 2102 appear duplicative, because they purported to appeal the same judgment. Appellants responded as follows:

lants")[1] appeal from the order entered on February 23, 2012, in the Court of Common Pleas of Philadelphia County, which granted a new trial solely on the issue of punitive damages, docketed on appeal at Docket No. 1013 EDA 2012.[2] Separately, Appellants appeal the entry of judgment on a verdict of breach of the covenant of good faith and fair dealing, intentional interference with contractual rights, and fraud, entered in favor of Michael Egan, Jr., Jill Egan, and Mark Buzby ("Appellees"), docketed on appeal at Docket Nos. 2109 EDA 2012 and 2334 EDA 2012. After review, we affirm.[3]

The trial court provided the following history of this case:

## I. Procedural History:

Plaintiffs filed a civil Complaint for fraud and related causes of action in July 2006 against the USI Defendants, which was consolidated with a virtually identical Complaint filed in 2008 against the USI Defendants in the Philadelphia

Although the cases were consolidated by the Trial Court, the parties and the Trial Court itself filed and/or docketed court filings inconsistently between the 2006 and 2008 matter. For instance, a comparison of the two dockets reveals that there are over 40 documents filed only in the 2008 Action that are not a part of the certified record in the 2006 appeal. This Court is currently attempting to remedy this discrepancy through its Order of Remand dated September 17, 2012, in which it remanded the case for, among other things, certification of the complete 2008 record. Given the inconsistencies and uncertainties concerning the consolidation of the 2006 and 2008 cases, USI, in an abundance of caution, filed appeals in both cases. This Court docketed one of the appeals at 2109 EDA 2012, and the other at 2334 EDA 2012.

Letter, dated and filed 11/13/12, at 2. On November 29, 2012, this Court discharged the rule to show cause and, by separate order, consolidated all three appeals, *sua sponte*.

Court of Common Pleas. On March 7, 2011, a jury returned verdicts in favor of the Plaintiffs and against all Defendants. Three (3) of the four (4) Defendants were found liable to Plaintiffs for the causes of action of intentional interference with contractual rights and fraud. Defendant Linda Magovern was found liable only for the cause of having breached the covenant of good faith and fair dealing.[1]

---

[1] During trial, this [c]ourt granted a non-suit/directed verdict in favor of the USI Defendants on Plaintiffs' claims for punitive damages.

The USI Defendants filed a Motion for Post–Trial Relief on March 17, 2011 alleging various errors and requesting a new trial on liability.[2] On February 23, 2012, the [c]ourt issued a Memorandum and Order denying the USI Defendants['] Post–Trial Motion. However, the [c]ourt Ordered a New Trial on punitive damages only. Defendants appealed the new trial on punitive damages.[3] On July 30, 2012, upon Praecipe, the [c]ourt entered an Order of Final Judgment. Defendants now appeal the Final Judgment to the Superior Court of Pennsylvania.[4] The Superior Court consolidated the two appeals on September 17, 2012.

---

[2] See, Memo. Order of Feb. 23, incorporated fully herein.

[3] Superior Ct. Appeal No. 1013 EDA 2012 (Currently pending).

[4] Superior Ct. Appeal No. 2109 EDA 2012.

## II. Factual History:

Plaintiffs were police officers employed with the Bristol Township Police Department when they were seriously injured by an uninsured motorist on August 27, 2005 during the course and scope of their employment. Bristol Township had a policy of automobile insurance through USI Holdings Corporation/USI Mid–Atlantic and Zurich American Insurance Company. Bristol Township decided to discontinue its policy of uninsured/underinsured motorist insurance ("UM/UIM") in 2005. Bristol Township failed to execute the appropriate waiver forms in order to reject the coverage.

In November 2005 Plaintiffs' attorneys requested the waiver of UM/UIM coverage forms. In January 2006 Ms. Batipps of USI Mid Atlantic wrote to Suzanne Newsome, the managing director of Bristol Township, enclosing UM/UIM waiver forms for her signature (which were print-dated 11/28/2005). Newsome backdated the waiver forms with the date March 1, 2005 (the policy inception date). USI knew the waiver forms were backdated. USI did not disclose that information to the Plaintiffs' attorneys or to Zurich when USI forwarded the signed waiver to those parties. Claims Advocate Robert J. Brown testified that he suggested that USI advise anyone inquiring about the waivers that Bristol rejected UM/UIM coverage, and then wait for the attorneys to request supporting documentation. Testimony revealed that USI was aware that the absence of the waiver forms presented a problem for USI. Mr. Brown, a Claims Advocate at USI agreed that a broker might be subject to an E & O [4] claim by an insurer for mistakes made by a broker, such as failing to get a form signed, if that failure led to an unwarranted coverage obligation.

The Plaintiffs and their attorneys relied on the signed waivers and represen-

---

4. Though the trial court did not explicitly state it, we understand this abbreviation to stand for "errors and omissions."

tations from USI as proof that no UM/UIM coverage existed. Throughout their investigations and various filings and court and arbitration proceedings [USI] swore under oath, in verified pleadings, and in discovery, as well as conveying in correspondences that the waivers were the proper statutorily required waivers and that they were valid and legally binding. The Plaintiffs['] attorneys said that if they had known the forms were backdated, then [they] would have made a claim for UM/UIM coverage. However, there were differences between the blank forms sent to Bristol in 2005 and the signed waivers sent on January 27, 2006. This raised their suspicions.

The jury heard testimony from a number of witnesses that it was not appropriate for USI to send blank claim forms for Newsome's signature after the date of loss, and that it would have been inappropriate for the forms to be backdated. The jury heard testimony that without the waiver forms coverage would have to be provided. Indeed, once Zurich learned that Newsome backdated the waivers, it changed its position and agreed to pay the UM/UIM benefits. The jury also heard testimony from Plaintiffs' experts that stacking coverage was required to be provided in commercial policies without a signed waiver.

The USI Defendants were aware that they had a responsibility to report claims or potential claims to Zurich. There was testimony that USI was obligated to provide true and accurate information to the Plaintiffs and/or their attorneys. There was evidence that withholding facts from either party was not appropriate. Plaintiffs' Expert William R. Ross testified at trial that whether or not it was Ms. Newsome's idea to backdate the forms, since USI knew they were backdated it had an obligation to advise those that the form was forwarded to that the date on the form was incorrect and that it was deceptive not to do so.

In terms of the impact of the backdated waiver, Plaintiffs had to wait until 2006 to receive UM/UIM benefits and that they were delayed until at least September 2006 in receiving stacked UM/UIM benefits. Defense experts opined that given the amount of money involved there was no delay. There was also a serious emotional impact on the Plaintiffs in not knowing how they were going to support their families, not knowing if they would walk again, and not knowing whether they would be able to work again.

Trial Court Opinion (T.C.O.), 1/18/13, at 1–4 (some footnotes citing to notes of testimony omitted).

Appellants enumerate nine issues on appeal, with a total of thirty-one subparts, many of which contain alternate rationales, presenting roughly forty questions for our review. For expediency of resolution, we have reorganized these issues to first address the trial court's denial of Appellants' motion for a new trial, followed by the trial court's grant of Appellees' motion for a new trial on punitive damages, and concluding with Appellants' issues with respect to judgment notwithstanding the verdict.

As an initial matter, we acknowledge that many of Appellants' issues turn on the question of whether the Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §§ 1701–1799.7 ("MVFRL"), mandates the formal written rejection of uninsured motorist/underinsured motorist ("UM/UIM") coverage and/or the rejection of stacked UM/UIM coverage in the context of commercial fleet automobile policies.

Throughout their brief on appeal, Appellants assert that the waiver provisions of the MVFRL do not apply to commercial fleet policies, and that, as such, any allegation of wrongful acts with respect to the rejection of UM/UIM and stacked UM/UIM coverage, are undermined by the inapplicability of these sections of the statute.

The provision and rejection of UM/UIM insurance are governed by Sections 1731–1738 of the MVFRL. Section 1731 of the MVFRL directs insurers to make a "mandatory offering" of UM/UIM coverage, prior to delivery or issuing a motor vehicle liability insurance policy. *See* 75 Pa.C.S. § 1731. The rejection of that coverage must be made by a written waiver, the precise language of which is provided by the statute.[5] *Id.* Separately, Section 1738 provides that, by default, UM/UIM benefits are subject to stacking. *See* 75 Pa.C.S. § 1738. This default stacking may be rejected and, again, the statute provides the language for this waiver.[6] *See id.*

In *Everhart v. PMA Ins. Group*, 595 Pa. 172, 938 A.2d 301 (2007), our Supreme Court considered whether the MVFRL mandates stacking of UM/UIM coverage in a commercial fleet policy. There, the appellant, Everhart's estate, asserted that this Court, the Superior Court, erred in holding that underinsured motorist benefits cannot be stacked under a commercial fleet policy. The appellant argued that, pursuant to Section 1738 of the MVFRL,

"all policies of insurance are required to provide for stacking of UM/UIM motorist coverage unless a valid waiver is executed by the named insured." *See id.* at 304.

The Supreme Court addressed the question as one of statutory interpretation. Turning to the language of Section 1738, the Court found that the statute does not explicitly exempt commercial fleet policies from its mandates and, in fact, the statute is "silent" on this issue. *Id.* at 305. Additionally, the Court found that the waiver language provided by the statute was couched in terms that did not strictly apply in the commercial context, specifically the terms "I" and "myself and members of my household." *See id.* at 306 (quoting 75 Pa.C.S. § 1738(d)(1)). Based upon the lack of an explicit direction within the statute and the wording of the waiver, the Court determined that the language of the statute was ambiguous. *See id.*

Because the statutory language left ambiguous whether the statute applied in the commercial fleet context, the Court was forced to look beyond the plain language of the statute to determine the intent of the General Assembly. Pursuant to the principles of statutory interpretation, the Court next reviewed "certain other considerations." *Id.* (citing 1 Pa.C.S. § 1921(c)). The Court looked to the purpose of the statute (namely economic concerns), the consequences of particular interpretations of the statute (stacking of a commercial

---

5. "By signing this waiver I am rejecting uninsured motorist coverage under this policy, for myself and all relatives residing in my household. Uninsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have any insurance to pay for losses and damages. I knowingly and voluntarily reject this coverage." 75 Pa.C.S. § 1731(b).

6. "By signing this waiver, I am rejecting stacked limits of uninsured motorist coverage under the policy for myself and members of my household under which the limits of coverage available would be the sum of limits for each motor vehicle insured under the policy. Instead, the limits of coverage that I am purchasing shall be reduced to the limits stated in the policy. I knowingly and voluntarily reject the stacked limits of coverage. I understand that my premiums will be reduced if I reject this coverage." 75 Pa.C.S. § 1738(d).

fleet would be prohibitively expensive), and to the former law. *Id.* With respect to the former law, the Court observed that, at the time of the 1990 amendments to the MVFRL, "there already existed a body of decisional law holding that stacking of uninsured and underinsured motorist coverage did not apply to commercial fleet policies." *See id.* at 306–07 (citing *Selected Risks Ins. Co. v. Thompson*, 520 Pa. 130, 552 A.2d 1382 (1989); *Lastooka v. Aetna Ins. Co.*, 380 Pa.Super. 408, 552 A.2d 254 (1988); *Miller v. Royal Ins. Co.*, 354 Pa.Super. 20, 510 A.2d 1257 (1986)). The Court observed, "It is well established that statutes are not presumed to make changes in the rules and principles of the common law or prior existing law beyond what is expressly declared in their provisions." *Id.* at 307 (citations omitted). Accordingly, because the legislature did not explicitly abrogate the existing law, the Court held that stacked UM/UIM coverage is not governed by Section 1738, at least in the context of commercial fleet policies. *See id.*

The instant case, however, concerns the misrepresentation of waiver documents that purported to reject stacked UM/UIM coverage in a commercial fleet policy under Section 1738 and which also purported to reject non-stacked UM/UIM coverage under a distinct statutory provision, Section 1731. Throughout their brief, Appellants assert that *Everhart* applies to Section 1731's non-stacked UM/UIM coverage, and that, like Section 1738, Section 1731 does not apply to commercial fleet policies.

■ Our Supreme Court has not addressed whether Section 1731, concerning non-stacked UM/UIM coverage, applies in the commercial fleet policy context. In cases filed prior to *Everhart*, this Court held that, contrary to Appellant's assertions, Section 1731, in fact, did apply to commercial fleet policies. *See National Union Fire Ins. Co. v. Irex Corp.*, 713 A.2d 1145, 1149–50 (Pa.Super.1998) (finding rejection of UM/UIM coverage in commercial automobile policy void because rejection did not strictly comply with requirements of Section 1731). Additionally, until today, this Court has not had occasion to address whether the Supreme Court's holding in *Everhart* impacts the applicability of Section 1731 to commercial fleet policies. This issue—whether Section 1731 of the MVFRL applies to commercial fleet policies—raises a question of law. In reviewing questions of law, our standard of review is *de novo* and our scope of review, to the extent necessary to resolve this legal question, is plenary. *See Everhart*, 938 A.2d at 304 (quoting *Swords v. Harleysville Insurance Companies*, 584 Pa. 382, 883 A.2d 562, 567 (2005)).

Appellants argue that Section 1731 is virtually identical to Section 1738. They argue that the sections must be read *in pari materia* with the *Everhart* Court's interpretation of Section 1738, and that, therefore, the only possible interpretation of Section 1731 is that it does not apply to commercial fleet policies. *See* Appellants' Brief at 51. Specifically, Appellants highlight the fact that, as with Section 1738, the waiver language of Section 1731 contains words ill-suited to the commercial context, *i.e.*, "I" and "my household." *Id.* at 51–52. Additionally, Appellants argue that the General Assembly did not intend that the requirements of the statute apply to sophisticated parties, such as those parties to commercial fleet policies. *See id.* at 54.

Like Section 1738, Section 1731 does not provide an explicit legislative directive that the provision apply to commercial policies. Moreover, we agree with Appellants that the waiver language provided in Section

1731 is substantially similar to that provided in Section 1738 and, resultantly, Section 1731 is also ambiguous as to whether the General Assembly intended it to apply in the commercial fleet policy context. However, despite Appellants' assertions to the contrary, the linguistic style of the Section 1738(d)(1) rejection form was not relevant to the *Everhart* Court's conclusion that Section 1738 does not apply to commercial fleet policies. As discussed above, the *Everhart* Court's conclusion was that the legislature, in enacting Section 1738, did not abrogate the existing case law. Unlike the well-established law holding that stacking of UM/UIM coverage does not apply to commercial fleet policies, we are unaware of a similar line of cases concerning non-stacked UM/UIM coverage. Without such prior law, *Everhart's* rationale with respect to Section 1738 is inapposite.

■ Instead, this Court is bound by our prior decisions, which concluded that Section 1731 applies to commercial fleet policies. *See National Union Fire Ins. Co.,* 713 A.2d at 1149–50; *Blakney v. Gay,* 441 Pa.Super. 547, 657 A.2d 1302 (1995); *see generally Douglas v. Discover Property & Cas. Ins. Co.,* 810 F.Supp.2d 724, 730–31 (M.D.Pa.2011) ("[T]he patent absurdity of stacking UM and UIM benefits in the commercial fleet context is the strongest explanation for [the Supreme Court of Pennsylvania's] decision in *Everhart* and no such absurdity results from forcing corporations to comply with the simple language found in subsection 1731(c)."). Accordingly, we conclude that, as a matter of law, Section 1731 mandates that UM/UIM coverage must be offered in the commercial fleet policy context, and pursuantly, the rejection of UM/UIM coverage is governed by Section 1731(b). *See* 75 Pa.C.S. § 1731; *National Union Fire Ins. Co.,* 713 A.2d at 1149–50.

We next proceed to Appellants' issues on appeal, beginning with Appellants' assertion that the trial court erred in denying their motion for a new trial on liability. Appellants primarily contend that they are entitled to a new trial on liability due to errors in the jury instructions. *See* Appellants' Brief at 49–67. Appellants also contend that they are entitled to a new trial based on "erroneous evidentiary rulings." *See id.* at 42–49.

■ In reviewing a denial of a motion for a new trial, our standard of review is as follows:

Consideration of all new trial claims is grounded firmly in the harmless error doctrine "[which] underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116, 1122 (2000). Once the trial court passes on the moving party's claim, the scope and standard of appellate review coalesce in relation to the reasons the trial court stated for the action it took. *See id.* Where the court is presented with a finite set of reasons supporting or opposing its disposition and the court limits its ruling by reference to those same reasons, our scope of review is similarly limited. *See id.* at 1123. Thus, "[w]here the trial court articulates a single mistake (or· a finite set of mistakes), the appellate court's review is limited in scope to the stated reason, and the appellate court must review that reason under the appropriate standard." *Id.* (quoting *Morrison v. Com., Dept. of Pub. Welfare,* 538 Pa. 122, 646 A.2d 565, 571 (1994)).

Our standard of review prescribes the degree of scrutiny we apply to the trial court's decision and the manner in which we evaluate its conclusions. *See id.* at 1122 (citing *Morrison,* 646 A.2d at 570). If the trial court's challenged ruling was one of law, we review its grant or denial of a new trial on that point to discern if the court committed legal error. *See id.* at 1123. Similarly, if the challenged ruling involved a discretionary act, we review the disposition of the new trial motion relative to that act for abuse of discretion. *See id.* "Discretion must be exercised on the foundation of reason." *Id.* Accordingly,

> [a]n abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion.

*Id.* (quoting *Morrison,* 646 A.2d at 570). "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Id.*

*Rettger v. UPMC Shadyside,* 991 A.2d 915, 923–24 (Pa.Super.2010).

Within this issue, Appellants argue that the trial court erred in instructing the jury on the necessity of waiver in commercial automobile policies, the unsettled nature of the law on stacked UM/UIM coverage in commercial policies, on duties relevant to the rejection of UM/UIM coverage, and in instructing the jury on fraud.

Before the issuance of a binding instruction, a court must consider the facts and evidence in the light most favorable to the opposing party, giving the benefit of all reasonable inferences

therefrom. *McElhinny v. Iliff,* 436 Pa. 506, 260 A.2d 739 (1970). "Binding instructions may not be given if there is a question of fact properly submissible to the jury." *Dible v. Vagley,* 417 Pa. Superior Ct. [Pa.Cmwlth.] 302, 307, 612 A.2d 493, 495 (1992), *petition for allowance of appeal denied,* 535 Pa. 619, 629 A.2d 1380 (1993) (quoting *Hogan v. Bryn Mawr Hospital,* 250 Pa. Superior Ct. [Pa.Cmwlth.] 109, 116, 378 A.2d 477, 481 (1977)). Where there is any evidence which alone would justify an inference of the disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof.

*Duquesne Light Co. v. Woodland Hills School Dist.,* 700 A.2d 1038, 1046 (Pa. Cmwlth.1997).

Here, however, the trial court instructed the jury:

> Now, ladies and gentlemen, very important that you listen carefully to me, it is an important issue in this case. Rejection slash waiver of uninsured motorist benefits. I instruct you that although the law was unsettled in Pennsylvania, the custom, practice, policy and conduct of the parties in this case may be considered. And in considering them, I instruct you that commercial policies should be considered, and commercial insurance policies such as the policy relevant in this case which was issued to Zurich—to Bristol by Zurich to Bristol Township in 2003 and renewed in 2004 and 2005 included uninsured motorist benefits unless the insured signed a written rejection form, also referred to as a waiver form, before a loss occurred.

> Therefore, I instruct you that as a matter of custom, practice, policy and conduct of the parties that the business auto policy issued by Zurich and Bristol

Township included one million dollars in uninsured motorist benefits.

Insurers who fail to comply with the precise letter of the statute have been consistently required to provide full uninsured motorist coverage.

I further instruct you that although, again, in Pennsylvania it was unsettled at the time, that the custom, practice, policies and conduct of the parties at the time of the plaintiffs' accident was that only a written waiver signed before the loss could definitely prevent a claim for stacked uninsured motorist benefits under a commercial insurance policy such as the policy relevant to this case.

In the absence of a waiver of stacked coverage signed before the loss, the victim of an automobile accident would have the opportunity to present a claim for stacked coverage under a commercial policy.

N.T., 3/4/11, at 231–233.

■ Our review reveals that, although the trial court qualified its language, it correctly instructed the jury on the law of UM/UIM coverage under Section 1731. The court explained that the policy at issue "included uninsured motorist benefits unless the insured signed a written rejection form, also referred to as a waiver form, before a loss occurred." *See id.* In light of our discussion of the law on the issue, *supra,* we find no error in this instruction.

■ Regarding the trial court's jury instruction on stacked UM/UIM coverage, Appellants correctly note that the trial court's instruction was flawed. *See* Appellants' Brief at 55–56. Section 1738's stacked UM/UIM coverage does not apply to commercial policies. *See Everhart,* 938 A.2d at 306. This was the law even prior to *Everhart. See Miller,* 354 Pa.Super. 20, 510 A.2d 1257.

■ We are aware, however, that the jury was presented with substantial evidence that suggested that, following the 1990 amendment to the MVFRL, the custom and practice of the industry was that only a written waiver signed before the loss could definitely prevent a claim for stacked uninsured motorist benefits. *See, e.g.,* N.T., 2/16/11, at 22–43; N.T., 2/17/11, at 7–23. This evidence presented a question of fact as to whether the Appellants believed themselves to be committing, and intended to commit, wrongful acts. The trial court, however, provided a binding instruction on this issue, foreclosing the jury from making its factual determination on the custom, practice, and policies of the industry. *See* N.T., 3/4/11, at 233. *Cf. Duquesne Light Co.,* 700 A.2d at 1046.

■ Nevertheless, we conclude that this instruction was harmless error. *See Rettger,* 991 A.2d at 923–24. The rejection/waiver forms at issue here consisted of a single page, which contained verbatim, the rejection language provided by Section 1731 and Section 1738. *See* 75 Pa.C.S. § 1731(b); 75 Pa.C.S. § 1738(d)(1); R.R. at 8050a (containing backdated waiver/rejection form). Any wrongful acts arising out of misrepresentations as to the effective date or the veracity of the rejections applied equally to both waivers. They were both on the same sheet of paper, actually signed on the same date, and dated, falsely, with the same date. Every action taken with respect to one was taken with respect to both. In light of the trial court's correct instruction on the law on rejection of non-stacked UM/UIM coverage, *i.e.,* Section 1731, we find no support for the conclusion that Appellants were prejudiced by the instruction on the industry practice surrounding stacked UM/UIM coverage. *See Rettger,* 991 A.2d at 923–24 ("A new trial is not warranted merely because some irregularity occurred during

the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake.").

Appellants next argue that the trial court erred in instructing the jury that the waiver must be signed before the loss in order to be effective. Appellants' Brief at 58–60. In our view, the trial court did not instruct the jury as a matter of law on this point, but rather, reminded the jury of the undisputed fact that Ms. Newsome signed the waiver forms after the accident. *See* N.T., 3/4/11, at 232. Appellants provide no argument as to how the restatement of an admitted fact prejudiced them, and we do not conclude that a new trial is warranted on this issue. *See Rettger*, 991 A.2d at 923–24.

 Appellants conclude their issues related to jury instructions by arguing that the trial court erred in instructing the jury on fraud. Appellants' Brief at 63–69.[7] Appellants argue that "an omission is actionable . . . only where there is an independent duty to disclose the omitted information." Appellants' Brief at 63 (quoting *Estate of Evasew v. Evasew*, 526 Pa. 98, 584 A.2d 910 (1990)). Appellants thus argue that the trial court erred in failing to instruct the jury that the existence of a duty to disclose is a requisite element of a fraud instruction. *See id.* at 64–65 (citing *Smith v. Renaut*, 387 Pa.Super. 299, 564 A.2d 188, 191–92 (1989)). Appellees correctly counter that their fraud claim was not premised on mere silence or an omission, but deliberate nondisclosure. *See* Appellees' Brief at 67.

The trial court instructed the jury as follows:

Plaintiffs have brought a claim against the USI defendants for fraud. A person who makes a fraudulent misrepresentation of a material fact to another person is responsible for all injuries resulting from that other person's reliance on the fraudulent misrepresentation.

In order for the plaintiff to recover against the defendant, you must find: One, that the defendants made a misrepresentation to the plaintiff; two, that the misrepresentation made by the defendant or defendants to the plaintiff or plaintiffs was fraudulent; and, three, that the misrepresentation was of a material fact; four, that the defendants intended that the plaintiffs rely on the defendants' misrepresentation; five, that the plaintiffs relied on the defendants' misrepresentation; and, six, that the plaintiffs' reliance on the defendants' misrepresentation was a factual cause— well, that's later. Well, I think that comes later in the second question, guys, No. 6. It says: Was it a factual cause? All right? I am striking that.

Okay[.]

So there [are] five elements. All right?

A misrepresentation is an assertion by words or conduct that is not in accordance with the facts.

A misrepresentation is fraudulent when the person making the misrepresentation, A., knows that it is untrue, knows that it is untrue [sic] or, B., does not believe that it is true or is indifferent as to whether it is true or, C., by

---

**7.** Appellants purport to include a sub-issue in their fraud instruction issue, arguing that the trial court erred by refusing to allow the jury to apportion damages in accordance with the fault of the individual defendants. The deter- mination of whether apportionment is appropriate lies within the discretion of the trial court. *Corbett v. Weisband*, 380 Pa.Super. 292, 551 A.2d 1059, 1079 (1988).

reason of special circumstances has a duty to know whether it is true.

A fact is material if it is one that would be of importance to a reasonable person in determining a choice of actions.

A material fact need not be the sole or even a substantial factor in inducing or influencing a person's decision.

A fact is also material if the maker of the misrepresentation knows that the person to whom it is made is likely to regard it as important, as important, [sic] even though a reasonable person would not regard it as important.

Reliance means a person would not act, would not have acted or would not have failed to act as he or she did unless he or she considered the misrepresentation to be true.

Fraud—reliance. In this case the plaintiffs have presented evidence that the defendants' alleged misrepresentations were received by and relied upon by the plaintiffs' attorneys, William Goldman and James McEldrew, and by Zurich Insurance Company.

The recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely. Instead, reliance is justified unless the recipient knows the misrepresentation to be false or if its falsity is obvious.

Okay.

I think you have all the definitions with respect to that count.

N.T., 3/4/11, at 224–227.

Appellants correctly observe that the trial court made no mention of duty in its fraud instruction. Appellants cite the Restatement (Second) of Torts § 551 for the premise that liability for nondisclosure exists only if the defendant is "under a *duty* to the other to exercise reasonable care to disclose the matter in question." *See* Appellants' Brief at 63 (emphasis supplied by Appellant) (quoting Restatement (Second) of Torts § 551(1)). Appellants proceed to note that that duty exists only in limited circumstances, including "when there is a fiduciary, or confidential, relationship between the parties." *See id.*

■ We observe, however, that the Comment to the Restatement's section 551 states "[C]ertain types of contracts, such as those of suretyship or guaranty, insurance and joint adventure, are recognized as creating in themselves a confidential relation and hence as requiring the utmost good faith and full and fair disclosure of all material facts." Restatement (Second) of Torts § 551, Comment; *see also Dercoli v. Pennsylvania Nat. Mut. Ins. Co.*, 520 Pa. 471, 554 A.2d 906, 909 (1989) ("The duty of an insurance company to deal with the insured fairly and in good faith includes the duty of full and complete disclosure as to all of the benefits and every coverage that is provided by the applicable policy or policies along with all requirements, including any time limitations for making a claim."). Although not instructed to find a duty on the fraud claim, the jury was properly instructed that, in order to conclude that Appellants were liable on the intentional interference with a contractual relationship claim, they must first conclude that there was such a contractual relationship. *See* N.T., 3/4/11, at 221–22. The jury found the same defendants liable under both that claim and the fraud claim. Accordingly, the jury found that a contractual relationship existed between the parties. As a matter of logical reasoning, the only possible basis for the contractual relationship was the insurance policy, which, as mentioned, is the type of contract that inherently creates a confidential relationship that requires the fair disclosure of all material facts. *See* Restatement (Second)

of Torts § 551. Upon this premise, we conclude that any error in the trial court's instruction was harmless. *See Rettger*, 991 A.2d at 923–24.

Additionally, Appellants argue that the fraud instruction was flawed in its description of reliance. We have held, "It is not enough simply to assert that a statement was fraudulent and that reliance upon it induced some action." *Blumenstock v. Gibson*, 811 A.2d 1029, 1038 (Pa.Super.2002). *See* Appellants' Brief at 65–67. Our Supreme Court recently explained, "Some time ago, we determined that a party who engages in intentional fraud should be made to answer to the party he defrauded, even if the latter was less than diligent in protecting himself in the conduct of his affairs." *Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 928 A.2d 186, 207 (2007). "[W]e have relied on the principle that the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but that he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious." *Id.* "We have stated that justifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction." *Id.* at 208.

▇▇▇ The court properly instructed the jury that, "The recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely. Instead, reliance is justified unless the recipient knows the representation to be false or if its falsity is obvious." N.T., 3/4/11, at 227. After a sidebar with counsel, the court added,

> The reliance doesn't necessarily have to be by the officers themselves, you know. Like, they don't have to go out

and do something or react to the alleged misrepresentation. But persons who are representatives of theirs, like here it was alleged the attorneys reacted, and also even if Zurich reacted, you know, Zurich being the ultimate insurer, if they reacted to this, in some form to this alleged misrepresentation. Okay? So then you still have reliance on the part of the alleged victims in this case.

*Id.* at 272–73.

▇▇▇ There was sufficient evidence placed before the jury for it to conclude that this element was met as a factual matter. Appellants argue that the trial court's use of the word "react" to describe reliance omits the requisite issue of a justification supporting that action. However, to the extent that the trial court used the word "react" as an *ad libitum* elaboration on its earlier instruction on reliance, we find any error to be harmless. The jury concluded that a confidential relationship existed between Appellants and Appellees, one that entitled Appellees to the utmost in good faith and fair dealing in the full disclosure of material facts. The confidential relationship between Appellants and Appellees, on its own, was sufficient to justify Appellees' reliance on Appellants' misrepresentations. *See Toy*, 928 A.2d at 207 ("[T]he recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but that he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious."). Accordingly, we find no error on this issue.

Appellants' remaining issues relating to its motion for a new trial on liability concern the admission of an email into evidence and the use of extraneous grand jury testimony in the cross-examination of Appellants' expert witnesses. Appellants contend that these events were in error,

and they demand a new trial on liability. *See* Appellants' Brief at 42–49.

■ As to the November 18, 2005 email between Mr. Brown and his USI supervisor, Donald Roberts, Appellants argue that the email was initially determined to be protected by the attorney-client privilege, but that Appellees subsequently obtained an unredacted copy of the email, and were permitted to introduce the email at trial. *See id.* at 42–45. Appellees maintain that any privilege was waived when the document became part of the public record in a criminal appeal to this Court. *See* Appellees' Brief at 53–58. The trial court did not address this issue in its opinion pursuant to Pa.R.A.P. 1925(a).

In their brief on appeal, Appellants provide no discussion as to why the attorney-client privilege applied to this email. Appellants only assert that the disclosure of the document into public record, and its use at trial, occurred over their objections and attempts to assert a privilege. Because Appellants have not established, as a fundamental matter, that the trial court erred in concluding that the attorney-client privilege should not apply to this document, we are not in a position to review whether its use at trial was in error, or whether Appellants are entitled to a new trial based upon that use. *See, e.g., Lackner v. Glosser,* 892 A.2d 21, 29 (Pa.Super.2006) ("[A]rguments which are not appropriately developed are waived.").

■ As to the use of extraneous grand jury testimony in the cross-examination of Appellants' expert witness, Appellants argue that this was error. *See* Appellants' Brief at 45–49. We have held, however, that the scope of cross-examination of an expert includes reports or records that have not been admitted into evidence, but which tend to refute that expert's assertion. *Collins v. Cooper,* 746 A.2d 615, 618 (Pa.Super.2000) (concerning cross-examination of medical expert with reports of treating chiropractor who did not testify and whose reports were not in evidence). Here, our review reveals that the grand jury testimony at issue was used exclusively on cross-examination of Appellants' expert witness, and, as such we find no error. *See id.* Accordingly, no relief is due upon Appellants' issues concerning the denial of their motion for a new trial on liability.

■ Next, we take up the trial court's decision to grant Appellees' motion for a new trial on the issue of punitive damages. As a general rule, the question of whether to order a new trial lies within the discretion of the trial court.[8] Here, the trial court explained its basis for granting Appellees' motion, stating:

> The [c]ourt is persuaded by [Appellees'] argument regarding the inconsistency of submitting the intentional interference with contractual relation, violation of the covenants of good faith and fair dealing, and fraud to the jury while denying the jury the opportunity to consider the question of punitive damages. The Court has reviewed and considered the cases [c]ited by Plaintiffs of *Noyes v. Cooper,* [579] A.2d 407 (Pa.Super.1990) and *Lesoon v.* [*Metropolitan Life Ins. Co.*], 898 A.2d 620 (Pa.Super.2006).

> The Plaintiffs presented evidence to the jury of actual fraud. The jury properly considered this evidence and found specifically that certain defendants participated in intentional interference with

---

**8.** We set forth our standard of review of a grant or denial of a new trial, *supra. See*

*Rettger,* 991 A.2d at 923–24.

Plaintiffs contractual relations and fraud.... Under these circumstances the jury should have been permitted to consider the question of punitive damages as to all four (4) Defendants.

Memorandum and Order, 2/23/12, at 2–3 (unpaginated). Accordingly, our scope of review is limited to these rationales. *See Rettger*, 991 A.2d at 923–24.

 Relevant to the issue presented here, we have held that an appellant may not recover punitive damages for an action sounding solely in contract. *DiGregorio v. Keystone Health Plan E.*, 840 A.2d 361, 370 (Pa.Super.2003). Where, however, a tort claim arises from an initial contractual relationship, tort recovery is permitted:

> In general, courts are cautious about permitting tort recovery based on contractual breaches. In keeping with this principle, this Court has recognized the "gist of the action" doctrine, which operates to preclude a plaintiff from re-casting ordinary breach of contract claims into tort claims.

> \* \* \*

> However, a breach of contract may give rise to an actionable tort where the wrong ascribed to the defendant is the gist of the action, the contract being collateral. The important difference between contract and tort claims is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie from the breach of duties imposed by mutual consensus. In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts.

*Hart v. Arnold*, 884 A.2d 316, 339–40 (Pa.Super.2005) (quoting *Pittsburgh Const.*

*Co. v. Griffith*, 834 A.2d 572, 581–82 (Pa.Super.2003)) (emphasis omitted).

 Instantly, the proceedings arise out of acts of fraud and misrepresentation, rather than, *e.g.*, a breach of contract by Zurich. Indeed, although initially a defendant, Zurich settled the claims against it. The settlement agreement confirmed that Zurich was not aware of the fraud at issue, discussed *infra*, until after a 2006 deposition in the instant litigation. No question of liability as to Zurich was presented to the jury. Therefore, there is no longer any suggestion of any impropriety by Zurich. The acts of the USI defendants, however, implicate social policies embodied in the law of torts, not obligations defined merely by the terms of their contract. Accordingly, the gist of this action is tort, rather than contract, and, consequently, punitive damages are recoverable.

 Turning to the issues raised by Appellants, in order to permit an award of punitive damages, a plaintiff "must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to intentional, willful, wanton or reckless conduct." *Hall v. Episcopal Long Term Care*, 54 A.3d 381, 395 (Pa.Super.2012), *appeal denied*, 620 Pa. 715, 69 A.3d 243 (2013) (quoting *Doe v. Wyoming Valley Health Care System, Inc.*, 987 A.2d 758, 768 (Pa.Super.2009)).

> Punitive damages will lie only in cases of outrageous behavior, where defendant's egregious conduct shows either an evil motive or reckless indifference to the rights of others. Punitive damages are appropriate when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct.

> Outrageous conduct is an "act done with a bad motive or with a reckless indifference to the interests of others."

"Reckless indifference to the interests of others", or as it is sometimes referred to, "wanton misconduct", means that "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Weston v. Northampton Personal Care, Inc.*, 62 A.3d 947, 961 (Pa.Super.2013) (quoting *J.J. DeLuca Co., Inc. v. Toll Naval Associates*, 56 A.3d 402 (Pa.Super.2012); *Smith v. Brown*, 283 Pa.Super. 116, 423 A.2d 743, 745 (1980)).

In *Lesoon*, a universal life insurance company was alleged to have made misrepresentations concerning their policy, committed forgery, and engaged in corporation-wide deceptive practices. *See Lesoon*, 898 A.2d at 634. The trial court, in weighing the evidence of widespread deceptive practices, declined to submit the issue of punitive damages to the jury, based on its conclusion that the forgery at issue was "not fraudulent conduct that would be undetected or that could not be readily remedied," and that the forgery "was not conduct that would cause substantial injury." *Id.* (quoting trial court memorandum). The appellants/insureds contended, however, that the insurance company's misrepresentation, forgery, and deceptive practices were sufficient to create a jury question on the issue of punitive damages. This Court agreed, concluding that because the plaintiffs presented evidence of "willful misconduct" and "reckless indifference to the rights of others," *see id.* at 634, the trial court erred in failing to place the issue of punitive damages before the jury. *See id.* at 634–35 (citing *Noyes, supra* ).

In the instant case, it was alleged that Appellants' actions were more than reckless—it was alleged that they were intentional. As noted above, reckless, intentional, willful, and wanton conduct each suffice to permit an award of punitive damages. *See Hall*, 54 A.3d at 395. As we have held in the past, it is often logically inconsistent and error for a trial court to submit to a jury an issue of liability for intentional wrongs, and yet refuse to submit the proximate issue of punitive damages. *See, e.g., Noyes*, 579 A.2d at 413 ("We are compelled to the conclusion that it was error, and logically inconsistent, to submit the issue of defendants' liability for intentional, fraudulent misrepresentation to the jury and yet refuse to submit the issue of punitive damages.").

Accordingly, the trial court's initial determination, *i.e.*, to preclude the issue of punitive damages from reaching the jury, was error. The court concluded that Appellees/Plaintiffs presented sufficient evidence to raise a question of liability for an intentional wrong, yet declined to submit the proximate issue of punitive damages to the jury. By granting the motion for a new trial on the issue of punitive damages, the trial court sought to remedy that error. In light of our standard of review, we discern no abuse of discretion in the trial court's determination to grant a new trial on the issue of punitive damages. *See Rettger*, 991 A.2d at 923–24.

We next address Appellants' second, third, fourth, fifth, sixth, and seventh issues, concerning the denial of Appellants' motion for judgment notwithstanding the verdict (JNOV). Our standard of review regarding these claims is as follows:

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered

for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*Buckley v. Exodus Transit & Storage Corp.,* 744 A.2d 298, 304–05 (Pa.Super.1999) (citations omitted).

■■■ Appellants sought JNOV from the jury's determination that they breached the covenant of good faith and fair dealing, intentionally interfered with Appellees' contractual rights, and committed fraud.[9] We first address Appellants' argument that they are entitled to JNOV regarding the jury's verdict of breach of the covenant of good faith and fair dealing. This Court has long held that the duty of good faith and fair dealing governs the transactions between an insurance company and its insured.

The duty of an insurance company to deal with the insured fairly and in good faith includes the duty of full and complete disclosure as to all of the benefits and every coverage that is provided by the applicable policy or policies ... This is especially true where the insurer undertakes to advise and counsel the insured in the insured's claims for benefits.

*Banker v. Valley Forge Ins. Co.,* 401 Pa.Super. 367, 585 A.2d 504, 510 (1991) (citation omitted). This duty extends to insurance brokers. *See id.*

■■■ Our review reveals that sufficient evidence was placed before the jury to support its determination on this issue. As the trial court explained, Appellees were third-party beneficiaries. "An injured person who makes a claim for uninsured motorist benefits under a policy to which he is not a signatory is in the category of a third party beneficiary." *General Acc. Ins. Co. of America v. Parker,* 445 Pa.Super. 300, 665 A.2d 502, 504 (1995). Moreover, as the trial court noted: "The jury heard testimony that Bristol Township was an insured on the policy. The jury heard that the claims advocates from USI are advocates on behalf of both Bristol and the [Appellees]. [Linda] Magovern specifically acted as an advocate on behalf of the [Appellees]." *See* T.C.O. at 5. As a result, we do not hesitate to conclude that this issue was properly placed before the jury, and that Appellants are not entitled to judgment as a matter of law with respect to the jury's determination.

However, Appellants also argue that the claim is time barred, on the basis that it was not asserted until 2010, and that there was no contract upon which to base a

---

9. Appellants also argue that USI was entitled to JNOV on all claims predicated upon the signed waiver of uninsured motorists benefits. *See* Appellants' Brief at 18–21. Appellants base this argument on two rationales: first, that Pennsylvania law does not require such a waiver, and second, that Appellees are Class Two insureds who are not entitled to uninsured motorist benefits. This issue is addressed thoroughly in our earlier discussion of the applicability of 75 Pa.C.S. § 1731 and § 1738.

claim. *See* Appellants' Brief at 22. Appellees disagree, arguing that the claim is based on the facts pled in their Second Amended Complaint, filed in 2008.

"We have held that it is not necessary that the plaintiff identify the specific legal theory underlying the complaint. Rather, it is the duty of the court to discover from the facts alleged in a complaint the cause of action, if any, stated therein." *Cardenas v. Schober,* 783 A.2d 317, 325 (Pa.Super.2001) (citations omitted). Appellees note that Paragraph 120 of their Second Amended Complaint states:

> Plaintiffs, as third party beneficiaries, and insureds under the policy of insurance issued to Bristol Township by Zurich American Insurance Company (which was coadministered and purchased through Zurich's agent, the USI defendants) are entitled to fair dealings in any and all transactions between the parties.

*See* Second Amended Civil Complaint, 8/6/2008, ¶ 120. Appellees also note Paragraph 115 of the same document, which alleges: "The USI defendants have continually acted in bad faith and fraudulently by, inter alia, denying that they knew the forms were backdated...." *Id.* ¶ 115. Our review of the complaint as a whole, including the paragraphs emphasized by the Appellees, shows sufficient facts alleged to put Appellants on notice of a claim for the omission of good faith and fair dealing.

■ In their fourth issue, Appellants argue that the trial court erred in refusing to grant JNOV on the issue of intentional interference with contractual relations. Specifically, Appellants claim that there was no evidence that USI intended to interfere with a contract or that USI's actions were improper. Appellants' Brief at 27–29. Our review of Appellants' brief on this issue reveals that it raised factual questions, which the trial court properly

submitted to the jury. *See id.* As noted above, in reviewing a question of sufficiency of evidence in an appeal from a denial of JNOV, "we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference." *Buckley,* 744 A.2d at 304–05. Appellants' argument on this issue merely asks this Court to draw opposite inferences from the jury. *See, e.g.,* Appellants' Brief at 29 ("[A]lthough USI sent a backdated form to Plaintiffs' counsel, they did not do so to be deceptive, but to confirm the fact that Bristol had waived UM/UIM coverage"). Our review of the record, in the light most favorable to the verdict winner, reveals sufficient evidence for the jury to base its determination on the elements of this claim.

Next, Appellants argue that the trial court erred in refusing to grant JNOV with regard to the issue of fraud. Specifically, Appellants contend that USI made no misrepresentations to Appellees' attorneys, that Appellees did not establish justifiable reliance on the waiver, that Appellees waived a "fraud-on-Zurich" theory through failure to plead it in their complaint, and that Appellees did not provide sufficient evidence of damages.

■ First, we address Appellants' arguments regarding misrepresentations made to Appellees' attorneys and justifiable reliance on the rejection/waiver of coverage. *See* Appellants' Brief at 30–33. Appellants' averments on these issues again ask this Court to make findings of fact contrary to those made by the jury. Because our review reveals sufficient evidence to permit a jury to make a determi-

nation on these issues, we do not disturb the trial court's denial of JNOV.

Second, Appellants assert that they were entitled to JNOV because the trial court "allowed Plaintiffs to argue a new fraud-on-Zurich theory after the close of their case." *See* Appellants' Brief at 33.[10] Appellants maintain that this issue was insufficiently pled in the complaint, that no evidence supports this theory, and that USI's failure to alert Zurich to the backdating is legally insufficient to establish fraud. Appellees, on the other hand, contend that a defendant can be liable for fraudulent misrepresentation made to a third party, if it was foreseeable to the defendant that damages to the plaintiff might result from the misrepresentation. *See* Appellees' Brief at 44 (citing *Woodward v. Dietrich*, 378 Pa.Super. 111, 548 A.2d 301 (1988)). Additionally, Appellees cite their Second Amended Complaint and specifically excerpt the places within it where they raised this issue. Our review finds the issue properly raised in the complaint. Appellants' arguments that the allegations were not specific enough, or were too "scattered" to preserve the issue, are without merit. *See* Appellants' Brief at 34. Additionally, the trial court, in its Rule 1925(a) opinion, discussed the fraud by USI toward both Appellees' attorneys and to Zurich. *See* T.C.O. at 4. As noted above, "If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case." *Buckley*, 744 A.2d at 304–05.

■ In Appellants' sixth issue, they claim that USI is entitled to JNOV on the issue of delay.[11] On this issue, the trial court explained that there was evidence presented at trial that the receipt of benefits was delayed due to the fact that the form was backdated.[12] T.C.O. at 6–7. "The jury heard testimony that there was a delay [from October of 2005] until at least September 2006 in receiving benefits. Although [Appellants] put on witnesses who disavowed that fact, the jury was free to make a decision about the credibility of the witnesses and decide that a delay existed." *Id.* We agree. The trial court properly placed before the jury the question of whether Appellees were entitled to interest, based on the delay in the receipt of benefits, which was alleged to have been caused by USI's actions. The evidence presented at trial sufficiently created a question of fact on this issue that the jury was entitled to determine. *See Buckley*, 744 A.2d at 304–05.

In Appellants' final issue, they argue that USI was entitled to JNOV on the issue of emotional distress. On this claim, the trial court explained:

10. Appellants also purport to incorporate this issue in their quest for a new trial. *See* Appellants' Brief at 65.

11. Appellants also discuss this issue in section V(D) of their brief, arguing that "legitimate questions regarding whether waiver forms were necessary and whether stacking was available in commercial fleet policies were likely to delay payment." Appellants' Brief at 36–37. We address these issues together.

12. The trial court referred to both UM/UIM benefits and to stacked UM/UIM benefits as benefits whose delivery was delayed by Appellants' actions. *See* T.C.O. at 6–7. As discussed above, Appellees were not entitled to stacked UM/UIM benefits as a matter of law, but were entitled to non-stacked UM/UIM benefits. We see no reason that the amount of benefits that Appellants were alleged to have delayed bears on the question of whether delay occurred, and whether Appellees were harmed by the delay. At trial, Appellees argued that the uncertainty of any coverage, at all, was the source of the harm from delay.

A party may recover damages for emotional distress for intentional interference with contractual relationship. The jury heard testimony that the result of the backdated forms had a devastating emotional impact on the Plaintiffs. The testimony revealed that without coverage, the Plaintiffs did not know how they would support their families. Because their injuries were so serious, they were unsure of whether they would be able to work again.

T.C.O. at 6 (citing *Hess v. Gebhard & Co., Inc.*, 769 A.2d 1186, 1195 (Pa.Super.2001), *rev'd on other grounds*, 570 Pa. 148, 808 A.2d 912 (2002)) (footnote omitted).

■■■ Appellants argue that a plaintiff can only recover damages for emotional distress based upon tortious interference with a contract if he first proves damages for the pecuniary loss of the benefits of the contract. *See* Appellants' Brief at 39 (citing *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879 (3d Cir.1981), *abrogated by Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982)).

We have held that, "[al]though non-pecuniary harms are recoverable in an intentional interference action, such an action cannot be maintained in the absence of pecuniary loss flowing from the interference." *Shiner v. Moriarty*, 706 A.2d 1228, 1239 (Pa.Super.1998). Appellees counter, however, that no such loss is required, and

that, if it were, the plaintiffs here established that they suffered pecuniary losses attributable to the eleven month delay in payment of UM/UIM benefits caused by Appellants' misconduct. *See* Appellees' Brief at 51. On the facts of the instant case, the issue of delay caused by Appellants' conduct was sufficiently addressed at trial and was properly placed before the jury, so as to determine the fact of pecuniary losses as a basis for emotional damages. *See also Buckley*, 744 A.2d at 304–05 ("If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV.").

Accordingly, for the reasons stated above, we affirm the trial court's order granting a new trial solely on the issue of punitive damages. We also affirm the judgment entered by the trial court with respect to the issues of liability and compensatory damages.[13]

Order granting a new trial on issue of punitive damages affirmed. Judgment affirmed. Jurisdiction relinquished.

PANELLA, J., files a dissenting opinion.

### DISSENTING OPINION BY PANELLA, J.:

While I agree with the Majority's apt description of the trial court's instruction

---

**13.** Additionally, on June 21, 2013, Appellees filed a motion in this Court "to apply the doctrine of judicial notice." Therein, Appellees note that Appellants' Reply Brief asserts that "criminal charges have not been pursued" in connection with the facts underlying the instant appeal. *See* Motion, 2/21/13 (citing Appellants' Reply Brief at 11). In their Motion, Appellees now ask this Court to take notice of the criminal dockets in *Commonwealth v. Freda Batipps*, 2009–3471, and *Commonwealth v. Robert Brown*, 2009–3469, in order to demonstrate that Appellants' Reply

Brief to this Court contains misrepresentations of fact, and that, in fact criminal charges are being pursued. We grant Appellees motion. *See* Pa.R.E. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *V.B. v. J.E.B.*, 55 A.3d 1193, 1206 (Pa.Super.2012).

on the necessity of a written waiver of stacked UM/UIM coverage as "flawed," I cannot conclude that the flaw was harmless error. I must therefore dissent from my esteemed colleagues in the Majority.

The Majority concludes that the errant instruction was harmless, as the written waiver at issue contained provisions for waiving non-stacked UM/UIM, pursuant to 75 Pa.C.S. § 1731, as well as for waiving stacked UM/UIM coverage pursuant to 75 Pa.C.S. § 1738. Furthermore, since Appellees presented evidence of industry practice and custom, and the trial court correctly instructed the jury on the issue of waiver of non-stacked UM/UIM coverage, the Majority reasons that the error on the issue of waiver of stacked UM/UIM coverage was therefore harmless.

Although I always hesitate to dissent from my learned colleagues, I do not reach the same conclusion here. In this trial, the jury was tasked with determining whether the Appellants were liable for fraud. The "flawed" jury instruction at issue here incorrectly buttressed plaintiffs' theory of the case that Appellants had a clear-cut motive to misrepresent the status of stacked UM/UIM coverage. The Supreme Court in *Everhart v. PMA Ins. Group*, 595 Pa. 172, 938 A.2d 301 (2007), clearly decided the issue to the contrary. Furthermore, Appellants presented expert testimony that disputed the existence of a settled custom or practice in the insurance industry regarding written waivers of stacked UM/UIM prior to the decision in *Everhart.*

Thus, the binding instruction undercut Appellants' theory of the case that they were not doing anything improper, under the law or the industry custom at the time, by not requiring a written waiver of stacked UM/UIM benefits. Appellants also argued to the jury that the failure to require a written waiver of non-stacked

UM/UIM coverage was an innocent practice that, given the decision reached only today by the Majority, was not explicitly against the law or industry custom at the time. To a substantial extent, the issue of the appropriateness of not requiring a written waiver of UM/UIM benefits was the central issue in this trial. I therefore cannot conclude that a binding instruction that stated that Appellants' central arguments were wrong as a matter of law was harmless error.